THE STATE v. McLAIN, Appellant.

Division Two, January 8, 1901.

1. **Practice:** DELIVERY OF JURY LIST: WAIVER OF PRIVILEGE. The right of a defendant to have delivered to him, in certain specified cases, a list of the jurors, twelve hours before the trial, is simply a personal privilege which defendant will be deemed to have waived by voluntarily returning into court the list of the jurors with his challenges, and permitting the trial to proceed without objection.

2. ————: ROBBERY: INSTRUCTION: INTENT. In order to constitute robbery, the property must have been taken with intent to steal, or to deprive the owner thereof without any honest claim to it on the part of the taker; and an instruction which tells the jury that if the offense was committed by a "willful and felonious" taking, etc., ignoring the essential element of intent, *held*, erroneous.

3. ————: ————: ————: "CORROBORATED:" FAILURE TO DEFINE. An instruction in regard to the corroboration of the testimony of an accomplice by that of other credible witnesses, which fails to explain to the jury the meaning of the word "corroborated," but leaves them to determine that for themselves, adjudged vicious.

Appeal from Cape Girardeau Circuit Court.—*Hon. Henry C. Riley*, Judge.

REVERSED AND REMANDED.

*Wilson Cramer* for appellant.

(1) Defendant, being indicted for robbery in the first degree, for which a minimum, but no maximum punishment is

prescribed, was entitled by law to a list of the qualified jurors twelve hours before trial. Laws 1895, p. 165. (2) The record not only failed to show that such list was delivered, or tendered to defendant, but shows affirmatively that the list of jurors was not offered to him until after the State had made its challenges. (3) The law must have some purpose, and the court below had no right to ignore its plain provisions and by so doing deprive defendant, directly or indirectly, of their benefit. Defendant is charged with a serious offense and was entitled to a list of the jury without demand. State v. May, 142 Mo. 135. (4) Instructions numbered one and two, which undertake to define robbery in the first degree, utterly ignore the charge of force and violence, and are, therefore, erroneous. State v. Crowell, 149 Mo. 391. These instructions, are also fatally defective because they do not properly define the offense of robbery in the first degree, in that they fail to declare upon the intent with which the taking must have been done. They are silent as to the intent, and therefore faulty. State v. O'Connor, 105 Mo. 121; State v. Johnson, 111 Mo. 578. (5) Instruction numbered three, relative to the admissibility and weight of the testimony of an accomplice, is erroneous. (a) Because it fails to explain what is meant by the terms "material to the issues" as used in the instruction. State v. Chyo Chiagk, 92 Mo. 413; State v. Miller, 100 Mo. 622. (b) Because it does not define the meaning of the word "corroborated." State v. Sprague, 149 Mo. 423; State v. Wesley and Jack Sprague, 149 Mo. 425.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for the State.

(1) A defendant can not accept the list and make his challenges, without objection and without so much as calling

the court's attention to the fact that he had not been furnished with the list, and then raise the point for the first time in his motion for new trial. State v. Gilmore, 95 Mo. 554; State v. Nagel, 136 Mo. 45. (2) The indictment in this case conjunctively alleges violence and putting in fear, and the proof showed only putting in fear, and the instructions, therefore, ignored the element of force. (3) Instructions numbered one and two were not erroneous, as ignoring the question of intent. The words willfully, feloniously and violently were used, and this was sufficient; the intent is inferable from the act. State v. Manley, 107 Mo. 364; State v. Noland, 111 Mo. 473.

BURGESS, J.—At the August term, 1899, of the circuit court of Cape Girardeau county, the defendant was convicted of robbery in the first degree and his punishment fixed at five years' imprisonment in the penitentiary, under an indictment charging him and one other person, to the grand jurors unknown, with feloniously assaulting one August Vornkohl, and by putting him in fear of some immediate injury to his person, and by force and violence to his person robbing him of the sum of $33.55, lawful money of the United States. After unsuccessful motion for new trial and in arrest, defendant appeals.

The facts are about as follows: Defendant and Vornkohl were neighbors and lived about eight miles north of the town of Cape Girardeau. On the third day of September, 1898, they were both in town, Vornkohl having gone in defendant's wagon. While they were there defendant paid Vornkohl $30 that he owed him for work and a wagon. About dusk they started home. Before that time, however, Vornkohl had suggested to defendant several times that they start home, but he was not ready.

After they had gone several miles on the road towards

home a man stepped out from behind a large tree, halted them, and demanded their money. Vornkohl testified with respect to what occurred as follows: "McLain, as quick as he said that, run his hand in his pocket, and gave him his money. I set there a good little bit. I thought may be he would go away. I told him I didn't have any money. He says, 'Give up your money,' I kept telling him I didn't have any money. Finally McLain says, 'You had better give up your money, he will shoot you,' and so I gave him thirty-three dollars and fifty-five cents, and McLain asked how much I gave him. I told him about forty or fifty dollars. As quick as I said that the robber jumped out of the wagon, out of the hind end and went down the road. After he got out McLain asked if I had a knife. I told him yes, I had a piece of one, an old barlow. He said, 'Let me have that; I will get the money back.' I gave him the knife and he went out and took the same road the robber did as far as I could see him. He was gone about ten or fifteen minutes. Then after he came back McLain asked me if he got all my money. I told him no, I had forty dollars yet. As quick as I said that the robber stepped back in the wagon again the second time. The second time he came back, McLain jumped out of the wagon, and I jumped out and took out running. He staid there; I run as fast as I could towards home; I got one hundred yards or more before I heard the wagon. Then I heard the wagon coming up the hill as fast as it could from the way it rattled. After it caught up with me I got in the wagon and went on a piece of the way home. He says, 'The best thing to do is to keep still about it, not say anything about it. If the fellow that done the robbing found out we didn't care he would finally leak it out.'"

T. M. Wilson was sworn as a witness on the part of the State, and testified in substance that in the forenoon of Septem-

ber 3, 1898, the defendant came to his house in Cape Girardeau, and proposed to him the robbery of Vornkohl. That he at first refused, but finally consented. That several meetings were had between them during the day, the last one being in the back room of a saloon called the Palace, where the plans for the robbery were arranged. By the arangement defendant was to keep Vornkohl in town until rather late in the evening, in order to give Wilson time to reach a place on the road about four and one-half miles north of town; McLain was to take Vornkohl home in his wagon, and on the way they would pass the place where Wilson was to be in waiting. When the defendant and Vornkohl should reach this place, Wilson was to spring into the wagon and demand money of both Vornkohl and defendant. The place agreed upon was a dark spot surrounded by trees, and when defendant and Vornkohl reached the place he commanded them to halt, and defendant stopped the horses. That he, Wilson, then sprang into the wagon, and holding his pocket knife in such a way as to make it appear like a revolver, demanded their money of them which defendant at once delivered to him, but that Vornkohl replied that he had no money and refused to give it up, until told by defendant that he had better give up his money or the robber would shoot him, when Vornkohl surrendered his money and he jumped out of the wagon and disappeared and went back to a bridge where defendant came to him, and asked him how much money he got, and witness told him he didn't know. That defendant says, "Well, lets divide," and I told him all right. He then said, "He has got some more money, come back and get the rest." That he told him to go to hell with the rest, that he didn't want any more. That defendant staid there about three minutes, and as soon as he got the money went back to the wagon, and when he and Vornkohl were about to proceed on their way that he, witness, again appeared when

Vornkohl ran away in the darkness down the road, the defendant soon following in the wagon.

It was shown that defendant repeatedly said that the robber was a negro.

The defendant introduced witnesses who swore that they had heard Vornkohl say that the robber was a negro, and that it could not have been McLain for he was not out of his sight during the robbery. Vornkohl on the witness stand denied that he ever made such statements.

The testimony of Thomas Wilson to the effect that the defendant came to his house during the forenoon and met him again about two o'clock in the afternoon, is contradicted by McLain's wife and her nephew, Vernie Ramsey, a boy of 14 years, who testified that he did not leave his home eight miles north of town until after one o'clock, and Ramsey swore that it was after four o'clock when he and defendant reached Cape Girardeau. August Kramer testified that he saw the defendant coming into town about four o'clock in the afternoon, but Henry Kramer, his brother, testified that he saw McLain in town at about two o'clock in the afternoon.

Wilson was corroborated as to these meetings, by William Sullivan, who testified to seeing defendant at Wilson's house in the forenoon and again early in the afternoon, and by Summers, the saloon keeper, who swore that Wilson and the defendant held a meeting in the back room of his saloon on that afternoon. Members of Wilson's household testified that they had seen the defendant at their house on several occasions. The defendant explained this by saying that Wilson's wife owed him some money for some hay, and that he had gone there several times to collect the debt, but each time without success.

Wilson swore that it was arranged between him and the defendant that the latter should pay Vornkohl some money that he owed him, before leaving town, so that such money, with

the rest which Vornkohl had, might come into their hands by means of the robbery.   The amount of this debt from Mc-Lain to Vornkohl was $45, and the defendant received from the mill for his wheat a check for $36, and went from place to place around the town trying to get the check cashed—it being after banking hours—so that he could turn over the money to Vornkohl.

The defendant in his testimony denied complicity in the robbery, and said that he never knew who the robber was until the prosecuting attorney in his opening statement said that it was Wilson.   He said he left his house in company with Vernie Ramsey, his wife's nephew, after one o'clock in the afternoon, and reached town with his wheat between four and five.   He denied having had any meetings with Wilson during the day, and said that he and Vornkohl were robbed at the place and in the manner before described, but denied that he had conspired with Wilson for the same to be done, or that he knew that it was going to happen; denied that he stopped the horse when the robber commanded them to halt, but said that the robber sprang into the moving wagon; denied that he met Wilson at the bridge and shared in the plunder, but said he followed the robber only about a dozen steps and then came back to the wagon.

William Sullivan testified that sometime after the indictment was preferred against defendant, defendant came to him and said that he would make it all right with him if he would get one Lynn for whom defendant knew he, Sullivan, had worked, to swear to something crooked, and asked him if he thought Lynn would do it, and that he, Sullivan, told him that he did not now.   That he also spoke to him about it later. Defendant denied these statements.

Over the objection and exception of defendant the court instructed the jury as follows:

"1.    The court instructs the jury if you believe and find from the evidence that the defendant in the county of Cape Girardeau and State of Missouri, at any time within three years, next before the finding of the indictment herein, either alone or with one Thomas Wilson, did willfully, and feloniously take from the person of August Vornkohl, a sum of money, the property of one August Vornkohl, by threatening to shoot said Vornkohl and putting him in fear of immediate personal injury and against his will, you will find the defendant guilty of robbery in the first degree, and assess his punishment by imprisonment in the penitentiary for a term of not less than five years.

"2.    Although the jury may believe from the evidence that one Thomas Wilson, willfully and feloniously did make an assault upon one August Vornkohl and take from his person a sum of money, the personal property of August Vornkohl, by threatening to shoot said Vornkohl, and putting him in fear of immediate personal injury and against his will, yet if you believe from the evidence that the defendant, George McLain, was present, aiding, assisting, abetting and comforting the said Thomas Wilson in such robbery, then the defendant, George McLain, is guilty of robbery in the first degree, equally with the said Thomas Wilson.

"3.    The court instructs the jury that the testimony of one who admits his complicity in the crime is admissible, yet such evidence when not corroborated by the testimony of others, not implicated in the crime, as matters material to the issue, ought to be received with great caution by the jury, and they ought to be fully satisfied of its truth before they should convict defendant on such testimony.

"4.    You are further instructed that you are the sole judges of the credibility of the witnesses testifying in this case, and of the weight to be attached to their testimony.    The

degree of credit due the witnesses should be determined by the jury, by their character and conduct, by their manner upon the stand, their relation to the case and to the parties, their hopes and fears, their bias or impartiality, the reasonableness or unreasonableness of the statements they make, the strength or weakness of their recollection, viewed in the light of other facts and circumstances given in proof. And if the jury believe any witness has willfully sworn falsely to any material fact in this case, you may disregard or treat as untrue the whole or any part of such witness's testimony.

"5. The burden of proof to establish the guilt of the defendant devolves upon the State, and the law clothes him with a presumption of innocence which attends and protects him throughout the trial, until it is overcome by testimony which proves his guilt beyond a reasonable doubt.

"6. Before you can convict the defendant you must be satisfied of his guilt beyond a reasonable doubt. By reasonable doubt is meant a doubt which has reason for its basis and arising out of the evidence in the case, considered as a whole, and not a mere possibility of the defendant's innocence."

The following instruction was asked by defendant and refused:

"The court instructs the jury that they should receive with great caution the testimony of one who admits his complicity in the commission of a crime; that they should not convict upon such testimony unless it is corroborated by the testimony of other credible witnesses, or other facts shown by the evidence."

It appears from the record that defendant was not furnished a list of qualified jurors twelve hours before the trial as provided by the Session Acts 1895, p. 165, amending section 4204, Revised Statutes 1889, which fixes the number of challenges, and provides that in cases mentioned in the first sub-

State v. McLain.

division of that section in which the punishment is death or imprisonment not less than for life, a list of qualified jurors shall be delivered to defendant twenty-four hours before trial, and in cases specified in the second subdivision, wherein a minimum but no maximum punishment is fixed, the list shall be delivered to defendant twelve hours before trial and that in all other cases such list shall be furnished before the jury is sworn if required. And defendant claims that the court committed error in not furnishing him with a list of qualified jurors twelve hours before the trial as required by said statute. This position is clearly correct unless the privilege was waived.

The record contains this entry:

"Now comes the prosecuting attorney and the defendant in person and by attorney also appearing, and both parties announcing ready for trial this cause is taken up and a list of the panel of thirty qualified jurors is delivered to the prosecuting attorney, who, after making his challenges, returns the list of jurors and the same is thereupon delivered to defendant's counsel who, after making his challenges, voluntarily returns into open court the list of jurors duly impaneled, sworn and charged as the law directs; comes now the jury as follows (names of jurors), twelve good and lawful men of the body of this county, and this cause progresses."

The State contends that from this entry it appears that defendant waived his right to a list of qualified jurors twelve hours before the trial by voluntarily returning into court the list of jurors with his challenges, and proceeding with the trial without objection. While upon the other hand it is conceded, that defendant could waive his right to have a list of the qualified jurors twelve hours before trial, it is insisted that, before there can be a waiver, there must be an offer to perform, and that the record should show affirmatively that a list of the

jurors was delivered or offered to defendant within the time prescribed by law.

In State v. Klinger, 46 Mo. 224, in speaking of the right of the defendant to a list of the jurors forty-eight hours before the trial, it is said: "The delivery of the list is an absolute and positive requirement only when the prisoner demands it. . . . . . . . . It is simply a privilege which the statute extends to the accused for his benefit, and if he does not make the demand or require the list he is presumed to have waived it." [State v. Waters, 62 Mo. 196; State v. Gilmore, 95 Mo. 554.] The same rule is announced in Peterson v. State, 45 Wis. 535; State v. Jackson, 12 La. Ann. 679; and in State v. Cook, 20 La. Ann. 145.

Our conclusion is that a right to a list of the jurors twelve hours before the trial, was simply a personal privilege which was waived by defendant by not demanding it, and in proceeding to trial without it.

Vornkohl on his cross-examination testified, that John W. Taylor told him if he would lay the robbery on McLain that he would get his money back, and the State, over the objection of defendant, was permitted to prove by Taylor that he made no such statement, but that what he said was "that if he could prove that McLain got his money that he could recover it; that McLain was responsible." This evidence, if it can be so called, was clearly incompetent and should have been excluded, but from the view we take of it, it was immaterial and harmless. It had no bearing whatever upon the issues involved, and could not in anyway have prejudiced the rights of defendant.

Nor was there error in excluding the first indictment found against defendant from the jury, as it was immaterial upon whose evidence it was found. It had been quashed, and another preferred.

Nor do we think under the circumstances, that the court erred in excluding evidence tending to show that the county court of the county offered a reward for the apprehension of the robber at the instance of the witness Taylor, for the reason that it could only have been admissible for the purpose of showing his interest in the prosecution, and as affecting his credibility when his evidence was immaterial, and of no importance whatever.

The indictment charges that defendant "by force and violence to his person thirty-three dollars and fifty-five cents, good and lawful money of the United States of the value of thirty-three dollars and fifty-five cents of the goods and personal property of the said August Vornkohl from the person, in the presence and against the will of the said August Vornkohl then and there with force and violence, and by putting the said August Vornkohl in fear of some immediate injury to his person, as aforesaid, willfully, feloniously and violently, did rob, steal, take and carry away, with intent," etc.

And the point is made that instructions numbered one and two, in undertaking to define robbery in the first degree, ignore the charge of force and violence, and are therefore erroneous. The case of the State v. Crowell, 149 Mo. 391, is relied upon as sustaining this contention, but that case is clearly distinguishable from the one at bar in this: In that case the indictment charged a robbery of a person by putting him in fear, and it was held error to instruct to find him guilty if he committed the robbery by force and violence to the person. In the case in hand the robbery is charged to have been done both by force and putting in fear, and the putting in fear alone being proved, the instructions properly ignored the element of force. It was held in State v. Cameron, 117 Mo. 371, that when separate and distinct offenses are mentioned disjunctively in the same section of the statutes, all of which are of

the same class and punishable by the same penalty, as in this case, they may be charged conjunctively in one count of an indictment, as if constituting but one offense, and such count will be sustained by proof of one of the offenses charged. This is the generally accepted doctrine.

These instructions are challenged for the further ground that they do not properly define the offense of robbery in the first degree, in that they fail to declare upon the intent with which the taking must have been done. [State v. O'Conner, 105 Mo. 121.] In that case the instruction which was condemned simply told the jury, that if the defendant assaulted William Franke, and by force and violence to the person of him, the said Franke, took from the person of him the said Franke against his will the watch named in the indictment, etc., they would find him guilty, regardless of the intent with which the offense was committed and it was held to be erroneous. The only difference between the instruction passed upon in that case, and the instructions complained of in the case at bar, is in the use of the words willfully, feloniously and violently in this case, which is claimed by the State to be sufficient. But in order to constitute robbery, the property taken must be with intent to steal, or to deprive the owner thereof, and the words used in the instruction do not necessarily import such a taking. In State v. Scott, 109 Mo. 266, it is said: "The word felonious, is descriptive of the grade of the offense, rather than of the criminal act which constitutes the offense, and ordinarily has no place in an instruction." "The use of the word feloniously in the instructions throws no light whatever upon the transaction." [State v. Johnson, 111 Mo. 578.]

And with respect to the words, "willfully" and "violently," it can not be inferred from the use of them that the assault was made with intent to steal, or to deprive the assaulted party of

his property.    It follows that these instructions must be held to be erroneous.

It is claimed that the third instruction is also erroneous upon the grounds that it fails to explain what is meant by the words "material to the issues," and because it does not define the meaning of the word "corroborated."    A similar instruction was disapproved in the case of State v. Chyo Chiagk, 92 Mo. 395, with respect to which, SHERWOOD, J., in speaking for the court said:    "Tested by these authorities, the instruction under discussion can not be held to fully meet legal requirements.    It is faulty in at least two particulars:    It fails to explain to the jury what is meant by the words, 'matters material to the issue.'    As to what those matters were, the jury were left to grope in the dark.    It fails to tell the jury that in order to the corroboration of the testimony of an accomplice, such corroboration should go so far as to identify the person of the prisoner against whom the accomplice speaks."

In the case of the State v. Miller, 100 Mo. 606, the sixth instruction given at the instance of the State was as follows:

"The court further instructs the jury that the testimony of a party aiding, assisting, encouraging and abetting a crime is admissible; yet such evidence, when not corroborated by the testimony of others not implicated in the crime as to matters material to the issues, ought to be received with great caution by the jury and they ought to be fully satisfied of its truth before they convict defendant on such testimony."    And it was held that it was faulty, for the same reasons mentioned in Chyo  Chiagk case, *supra.*

The instructions condemned in these cases are substantially the same as the instruction under discussion which must be held bad for the same reasons.    While it is true there was evidence tending to show that defendant and Wilson were accomplices in the robbery of Vornkohl and in this respect cor-

roborated Wilson, the jury were not told what was meant by "corroborated," but were left to determine for themselves whether it was meant in some unimportant matter, or the identification of defendant as the person whom Wilson testified was his accomplice, and was therefore vicious.

The judgment should be reversed and the cause remanded. It is so ordered. *Gantt, P. J.*, and *Sherwood, J.*, concur.