STATE OF MISSOURI, Respondent, v. WILLIAM RODDIE BARTLETT, Appellant, No. 41432—224 S. W. (2d) 100.

Division One, November 14, 1949.

*Chas. A. Miller, W. V. Mayse* and *C. C. Ross* for appellant.

*J. E. Taylor,* Attorney General, and *Lawrence L. Bradley,* Assistant Attorney General, for respondent.

CONKLING, J.—William Roddie Bartlett, defendant-appellant, was convicted of second degree murder and appealed from the judgment and sentence fixing his punishment at ten years imprisonment. His defense was self-defense. For reasons we hereinafter state, the judgment is reversed and the cause remanded.

Defendant and the deceased, Ben Hall, had each married sisters. From the father of their wives they had obtained their respective and adjoining Harrison County farms near Bethany. At the time of the killing the deceased, Hall, · lived alone on his farm. The defendant had rented his farm to one O. B. Hammonds, who lived on the farm. Defendant lived in nearby Bethany with his wife. Defendant was 74 years of age. Hall was a year or two younger.

For many years defendant and Hall had been unable to get along with each other. Their first trouble was in 1905 over some pasturage rights for stock. They thereafter had further trouble with each other in 1908 and again in 1912 over some stock. In 1923, they had quite serious trouble over the location of a line fence beween their respective farms. At that time, without provocation and when defendant was trying to avoid the trouble Hall "flew into a rage", attacked defendant, beat him up quite badly with a hammer, severely injured him and defendant's hearing was thereafter permanently impaired in one ear. Hall threatened to kill defendant and said, "I would like to finish you * * * I will finish you yet". Thereafter the trouble and threats continued at intervals, but without further physical combat. Deceased said to defendant, "I am going to beat your damn brains out * * * I will shut your mouth up forever". Frequent

threats against defendant were made by deceased on many occasions thereafter. Defendant repeatedly told Hall he did not want any trouble between them; and said to Hall that it would be better if each of them never came on the land of the other.

On October 31, 1947, before defendant shot Hall. on November 5, 1947, further trouble occurred. On that occasion defendant was sitting with a number of others in a pool hall in Bethany. Hall came in, walked up to defendant, abused him, and a number of times called him a liar. Defendant said, "I don't want any trouble with you, Ben, we had plenty of trouble, a lot of trouble, but I don't want any trouble with you". Defendant said that two or three times. Hall said to defendant "* * * you are going to have trouble with me and plenty of it if you don't quit your lying". When defendant started to arise Hall moved closer to him, shook his fist under defendant's nose and said, "Don't try to get up, I will put you down and put you down for good. I did it once and can do it again". No physical combat resulted on that occasion.

On November 5, 1947 defendant had gone from Bethany to his farm, which Hammonds rented, to make a concrete trough for the dairy cattle. Shortly after ten o'clock that morning defendant was in his back yard and barn engaged in that work. While so engaged Hall, in his motor car, drove across a field, opened a gate and drove into the back yard of defendant's farm, where the latter was then at work. Hall lived a half mile west, and when the road was muddy used that route out to the highway. Hammonds, the tenant, was preparing to assist defendant but had been in the garage for about 10 minutes getting some anti-freeze for a tractor. Mrs. Hammonds ▮▮▮▮ was also about the place but neither Hammonds nor his wife saw the shooting. The transcript does not clearly disclose whether they were close enough to have heard any conversation between Hall and defendant. Neither testified to having heard anything except the shot.

Defendant testified: That he did not know Hall was in his (defendant's) farm yard until he saw Hall by the side of his (Hall's) motor car; that Hall got into his car and closed the door; that at that time he was not certain that Hall saw him (defendant); that Hall then stuck his head out the window and looked out at defendant, then opened the car door, jumped out and closed the door, walked out in front of defendant, and looked like he (Hall) was "ready to attack"; that defendant said to Hall, "Ben me and you had a lot of trouble * * * I told you to stay out of my yard and we wouldn't have any trouble and wish you'd get in your car and drive out and stay out"; that Hall then said, "I don't have to get out"; that defendant then said, "Well, you gave me an awful abusing up to the pool hall the other day, awful cussing, and I hadn't said a word in the world to you. I don't like you to do that, I wish you would get

out of my yard''; that Hall then said, ''You walk out in that road and we will settle it for good''; that defendant then said, ''I ain't going with you no place'', and told Hall ''I didn't want to have no trouble with him''; that Hall then said, ''I will just settle it with you if you go down there'' (into the road); that Hall had his right hand in his right pocket, was facing defendant and yelled ''Are you going to go''; that defendant then replied, ''No''; that Hall then ''started at me'', saying ''we will settle it right now''.

Defendant further testified: That he was then afraid of Hall and feared Hall was going to kill him or do him serious bodily harm; that he thought Hall was going to shoot him or ''come at me with a knife''; that he thought ''it would be mine or his (life)'', so he took a gun from his hip pocket and shot Hall in the head as Hall ''come right toward me'', and Hall fell forward at defendant's feet; that as Hall rushed at him Hall looked like he was ''going to tear me up if he come''. The above was all of the testimony as to what occurred at the time of the fatal shooting. Hall died as the result of being shot by defendant. Later search of Hall's clothing revealed no gun but a pocket knife was found.

■ Defendant assigns as error (but does not seriously urge) that the trial court erred in refusing to instruct the jury to find him not guilty. The evidence establishes that defendant intentionally killed deceased with a deadly weapon. That is sufficient to sustain a conviction of second degree murder. State v. Hogan, 352 Mo. 379, 177 S. W. (2d) 465, and cases cited. Under this evidence the trial court was required to submit the case to the jury, and upon proper instructions. The credibility of the parol evidence and the weight thereof are for the jury. The testimony tending to establish that the defendant shot the deceased in self-defense was likewise required to be submitted to the jury upon proper instructions. Even upon a correct self-defense submission, the jury does not have to believe the defendant's testimony tending to establish self-defense, although that testimony is not controverted by any other testimony in the case. The point made is without merit. The demurrer to the evidence was properly ruled.

■ The main contention between counsel for the state and for the defendant upon this appeal is the propriety of instruction number 5, given by the court upon the question of self-defense. A portion of the first paragraph of that instruction correctly stated the law in general terms, in a case where the evidence warranted the instruction. But even though the general rule in part is correctly stated, portions stated therein are without factual support because there is no testimony of record, nor are there any circumstances from which the jury could conclude that the difficulty between deceased and defendant was ''sought or induced by defendant's own willful act'', nor is there proof or circumstance that defendant ''voluntarily and

of his own free will'', entered into the ''difficulty with the intention of killing or doing some great bodily harm'' to the deceased.

The second paragraph of instruction 5 was in these words: ''If, therefore, you do believe and find from all the evidence in the case that the defendant shot and killed Ben C. Hall unnecessarily, and when he did not have reasonable cause to believe that the said Ben C. Hall intended to kill him or do him some great bodily harm, or that the defendant sought out the said Ben C. Hall or went over to the place where the said Ben C. Hall was for the purpose of engaging the said Ben C. Hall in a quarrel, or that the defendant willfully engaged in a quarrel with the said Ben C. Hall for the purpose of avenging an insult made against him or an assault made upon him at some previous time by deceased, with the willful intention of taking the life of the deceased to avenge such an insult or assault, then there is no self-defense in the case, and you cannot acquit him on that ground.''

There is no evidence in this case nor any circumstance from which the jury could find that (1) ''defendant shot and killed * * * Hall unnecessarily and when he (defendant) did not have reasonable cause to believe that * * * Hall intended to kill him or do him some great bodily harm,'' (2) ''defendant sought out * * * Hall or went over to the place * * * Hall was for the purpose of engaging * * * Hall in a quarrel'', (3) ''defendant willfully engaged in a quarrel with * * * Hall for the purpose of avenging an insult made against him (defendant) or an assault made upon him at some previous time by deceased, (or for any other purpose) with the willful intention of taking the life of deceased to avenge such an insult or assault''. And the mere fact that the jury were at liberty to disbelieve all or any part of the testimony establishing self-defense, and the fact that the evidence in the case was sufficient to sustain a conviction, did not warrant the court hypothesizing in the self-defense instruction either (1), (2) or (3) above, not one of which had any record support whatever. Instructions must be based upon the evidence. A self-defense instruction containing the above set out matters cannot be given unless the facts or circumstances with respect thereto justify and support it. Instruction 5 is reversibly erroneous. State v. Daugherty, (Mo. Sup.) 196 S. W. (2d) 627, State v. Williams, 337 Mo. 884, 87 S. W. (2d) 175, 100 A. L. R. 1503, 41 C. J. S., Homicide, pp. 171, 172, State v. Painter, 329 Mo. 314, 44 S. W. (2d) 79, State v. Layton, 332 Mo. 216, 58 S. W. (2d) 454, State v. Singleton, (Mo. Sup.) 77 S. W. (2d) 80, People v. Clark, 368 Ill. 183, 13 N. E. (2d) 269.

As to (1) above, the only evidence in the case, and all the evidence, is that defendant did believe (and had reasonable cause to believe) that Hall intended to kill him or do him some great bodily harm. Defendant was advanced in years, of slight build, in ill-health, had

been once badly beaten by Hall, and just five days before had been threatened by deceased. Deceased was taller, stronger, heavier by many pounds, robust, in good health, was advancing upon defendant threateningly, hand in pocket, saying, ''We will settle it right now'', and looked like he was ''going to tear me up if he come''. There is neither fact nor circumstance to the contrary. As to (2) above there is absolutely no evidence that defendant sought out Hall or went over to the place where Hall was to engage Hall in a quarrel. All the evidence is to the contrary. Defendant was in his own farm yard engaged in making a concrete trough. Hall came there and without permission entered upon defendant's property. Defendant did not seek Hall out, nor did defendant go ''over to the place where Hall was for the purpose of engaging Hall in a quarrel''. Defendant merely stood his ground while Hall advanced upon him. That defendant had a right to do. Defendant neither had nor manifested any ''purpose of engaging Hall in a quarrel''. Defendant sought to avoid any difficulty, declined to quarrel and twice told Hall, ''I wish you would get out of my yard''. As to (3) above, the testimony and circumstances of record (space forbids further repetition) clearly establishes that (a) defendant did not willfully (or otherwise) engage Hall in a quarrel, (b) to avenge an insult or assault (or for any other purpose), (c) with the intention of taking Hall's life (or with any other intention).

As to defendant having an intention to avenge insult or assault ''made upon him at some previous time by deceased'' (as hypothesized in (3) above), not only is there no fact or circumstance in the record to support that submission but, if such were conceded, the ''insult or assault'' referred to in the instruction was too remote to make them a part of ''the difficulty'' within the law. Previous insults or the 1923 assault were so far removed from November 5, 1947, that they cannot be thus used to cut down defendant's right of self-defense. State v. Williams, supra, 40 C. J. S. § 119, page 990.

The basic function of an instruction is to aid the jury to apply the law as declared by the court to the facts in evidence. And the instructions must cover such legal principles, applicable to the evidence, which are necessary for the jury to apply to reach correct conclusions on submitted issues. They declare the legal effect of a state of facts, if such facts be found by the jury to have existed. But the court cannot predicate a wholly fictitious fact situation, one which the evidence does not show to have existed at all. And certainly, in a case where the defense is self-defense, and with respect to which the court *must* instruct (and correctly instruct), Mo. R. S. A. § 4070, it is reversible error for the court to suggest (by hypothesizing them) the existence of three separate and wholly fictitious fact situations and tell the jury that if any one of the three be found, ''there is no self-defense in the case and you cannot acquit him (defendant) on that ground''.

It is to be remembered that instruction 5 is not a mere negative instruction telling the jury that unless they found the facts above (which constitute self-defense) that the defendant could not be acquitted because of self-defense. No instruction in this case submitted to the jury the facts respecting self-defense as testified to by defendant. And that was all the testimony there was in the case about self-defense.

The case is unlike State v. O'Leary, (Mo. Sup.) 44 S. W. (2d) 50, and those cited by counsel for the state wherein the facts and circumstances of record supported the instructions considered in those cases. The cited cases have been carefully examined but are no authority under the situation existing here. Instructions, A, B, and C given at defendant's request and covering different phases of defendant's good faith, apprehension of danger, whether actual, and whether reasonable or otherwise, do not cure the error in giving instruction 5.

█ Defendant next contends that his written statement of the occurrence was erroneously admitted because not voluntarily made. A short time after the shooting defendant was arrested at his home in Bethany. Accompanied by two state patrolmen, the sheriff and his two deputies, the defendant was taken to the office of the Prosecuting Attorney where he made a statement which was reduced to writing. In all he was in the office of the Prosecuting Attorney for only 40 minutes. The Prosecuting Attorney first asked defendant if he had a lawyer and told him that he could have a lawyer present if he desired to do so; and also told defendant "he didn't have to make a statement if he didn't want to do so". Defendant was told "this statement could be used against him in the case"; defendant said, "I don't care, it is a statement (of) what happened down there". Defendant then stated what was written in the statement, including the story of the trouble in the pool hall. The Prosecuting Attorney wrote all that down in long hand; but the Prosecuting Attorney did not write down "some of the material about his (defendant's) background", history, etc., which had nothing to do with the shooting, or their previous trouble. He did record in the written statement all the facts of the shooting and their prior difficulty which were related to him by defendant. After the statement had been written it was read aloud while defendant followed the reading, looking at the statement over the shoulder of the Prosecuting Attorney. Defendant then signed it. Shortly thereafter copies of the statement were furnished defendant's counsel.

Upon objection to the statement the court excused the jury and, out of the jury's presence, heard testimony bearing upon the voluntariness of the statement. There was no testimony that the statement █ was not voluntary. All the testimony was that it was voluntarily made. That testimony was reheard in the jury's presence

and the written statement was admitted. At the close of the testimony the court properly, in a correct instruction, submitted to the jury the question of whether the statement was voluntarily made.

It is contended for defendant that the statement was not voluntary because (a) when the statement was made defendant was "flanked by two patrolmen, with their guns, and by the sheriff and his deputies", and (b) "defendant made several statements that were not included in the written statement". A confession is not rendered involuntary because a defendant is under arrest or in custody when questioned about a crime. State v. Pillow, (Mo. Sup.) 169 S. W. (2d) 414, and cases cited. We have carefully read this transcript, and we have scrutinized the testimony concerning the confession, and find (b) above without merit. On that occasion some things were said by defendant which were wholly irrelevant to the inquiry then at hand and to the offense which was then being investigated. It was not vital to the voluntariness of the confession that such irrelevant matter, background material, history, etc., should have been recorded within the written confession.

Defendant also assigns as error that the court permitted answers to a number of isolated questions asked of various witnesses. We have examined them all and find no merit in them. As to some of the questions defendant's counsel failed to make any objection whatever; as to two of them an examination of the record discloses that defendant's objections were sustained; as to another, counsel failed to preserve defendant's right to review in the mode prescribed by Mo. R. S. A. § 4125. In any event, none of them could be determinative of this appeal, are not likely to recur upon another trial and we need not discuss or rule them.

Error is assigned in permitting the Prosecuting Attorney to argue the case to the jury after having testified upon the issue of whether defendant's confession was voluntary. The record before us discloses no objection by defendant to permitting the Prosecuting Attorney to argue the case. It shows but a single objection to an isolated comment made by the Prosecuting Attorney during the course of his jury argument. Nor is the claimed error which is assigned preserved in the motion for new trial as is required by Mo. R. S. A. § 4125.

The judgment is reversed and the cause is remanded. It is so ordered. All concur.