**STATE of Missouri, Respondent,**

v.

**Robert HARRIS, Appellant.**

**No. 46183.**

Supreme Court of Missouri.
Division No. 2.

June 9, 1958.

Raymond A. Bruntrager, St. Louis, for appellant.

John M. Dalton, Atty. Gen., John W. Inglish, Asst. Atty. Gen., for respondent.

STORCKMAN, Presiding Judge.

The defendant, Robert Harris, was found guilty of buying and receiving stolen property in violation of Section 560.270 RSMo 1949, V.A.M.S., and his punishment was assessed at six years in the penitentiary. Defendant's motion for a new trial was overruled and he has appealed.

The defendant, his wife, Jewel Harris, and his brothers Hosea Harris and Edward Ezra Harris, referred to in the evidence as Ezra Harris, were indicted jointly. The defendant, Robert Harris, was granted a severance; at his separate trial he did not testify or introduce any evidence in his behalf.

The evidence of the state tended to prove that during the early evening of November 9, 1955, the home of Mr. and Mrs. Andrew Johnson at 16 Portland Place in St. Louis was burglarized by William Topp. While the family was downstairs the thief entered through a second-story window. From an upstairs bedroom and locked closet he took and carried away a full-length mink coat, a mink stole, a diamond ring, two diamond bracelets, a pair of earrings, and a stickpin. The mink coat at the time of its purchase eight years previously cost $3,500 and the mink stole, purchased about 25 years before, cost $600 or $700. The diamond ring, approximately 13 to 14 carats in size, was valued between $25,000 and $30,000. There was some testimony that, assuming the diamonds to be of reasonably good quality, the bracelets "would be in the twenty to twenty-five-thousand-dollar bracket."

Topp, as a witness for the state, testified that he drove to the Johnson home in the automobile of Hosea Harris. He denied, however, that Hosea knew that he was going to rob the Johnson home. After stealing the jewels and furs, Topp carried them in the automobile to the home of Hosea Harris and left them with Mrs. Hosea Harris who, except for some of her children, was the only person there. He returned the next day and saw Hosea Harris at about 1:00 o'clock p. m., and again about 3:00 o'clock p. m. On November 11 Topp saw Hosea Harris at about 1:00 p. m. and again that evening between 7:00 and 7:30. On this last trip Topp received from Hosea Harris the sum of $4,000 consisting of twenty-eight $100 bills and the remainder of the amount in $20 bills. Topp was later arrested, released and again arrested on November 19, 1955, and held for investigation. In the early morning of November 20, Topp told the police that he had given the stolen articles to Ezra Harris.

Topp had known Robert Harris for a period of about eight years, but he did not tell the defendant that he intended to commit the burglary or that he had stolen the articles. He did not see Robert Harris until after the articles had been recovered on November 21, 1955. Robert Harris was arrested on Sunday, November 20, 1955, and taken to the office of the chief of detectives about 9:30 p. m. About 3:00 o'clock a. m. on November 21, after the defendant had been given a lie detector test, he was told by the police that up to that time the investigation showed he was not involved. However, he was also told that his home and the homes of his brothers were going to be searched under a warrant; that Ezra Harris had been given a lie detector test; that he, Ezra, had said that he had had the stolen articles and after negotiating a sale for them had given them back to Hosea.

The stolen property was insured and the state's evidence tended to show that while he was being questioned in the office of the chief of detectives a suggestion was made to the defendant "along the lines" that if the stolen property was recovered by him he would receive a reward. This suggestion was made more than once by the police offi-

cers interrogating the defendant. The defendant requested that he be permitted to talk privately with his brothers, Hosea and Ezra, who also were being held at the police station, and he was permitted to do so. After he had talked to his brothers for about twenty minutes, the defendant told the police officers that he could get the stolen property back but it would take about $5,500 because it had been disposed of for that amount. This occurred about 3:30 a. m. on November 21st. The police arranged a meeting at the Boatmen's National Bank for 9:00 a. m. the same day, at which representatives of the insurance company were present. The defendant was taken to the meeting by Sergeant Grimes, attached to the Detective Bureau of the St. Louis Police Department. The representatives of the insurance company procured $5,500 in bills of $100 denomination, the serial numbers of which were recorded by officers of the bank. The defendant asked if the bills were marked and was told that they were not. He was not told that a record of the serial numbers had been made. Copies of the list of serial numbers were given to the representatives of the insurance company and eventually a copy was delivered to the police department.

At this meeting at the bank there was conversation to the effect that the defendant would act as courier for the insurance company in the recovery of the stolen articles, and things were said indicating that the insurance company might be grateful in a pecuniary way if the mission was successful. The $5,500 was delivered to the defendant and he gave a receipt to the representative of the insurance company reciting: "Received from Elmer Rinderknecht the sum of $5500.00 in connection with the recovery of jewelry of Andrew W. Johnson, stolen on November 9, 1955." The defendant then turned the money over to Sergeant Grimes.

Two police officers, Sergeant Grimes and Detective Spencer, then took the defendant to his home. After the police officers had been there for about 15 minutes they left and were absent for about 35 minutes. When they returned about 11:20 a. m., the defendant and his wife were there. At that time Sergeant Grimes turned the $5,500 in currency over to the defendant. Mrs. Harris left the house about 15 minutes later, or around 11:35. Thereafter the defendant received two phone calls, one at about 12 o'clock noon, during which the defendant was heard to ask, "Was she followed?" After the second phone call, which was about 12:20 or 12:25 p. m., the defendant said, "O.K., gentlemen, we can leave now." The defendant and the two police officers drove to a bar at Euclid and Delmar where they stayed for about 25 minutes; then they drove to a filling station located at Walton Avenue and the Hodiamont street car tracks. The defendant gave Sergeant Grimes a key and told him to open the trunk of a 1955 blue Mercury parked on the filling station premises along with several other cars. There was no license tag on the Mercury automobile and Sergeant Grimes made a scratch mark with the key on the trunk of the car for identification purposes. Sergeant Grimes opened the trunk of the Mercury and took a suitcase from it. Upon opening the suitcase he found a full-length fur coat and a fur scarf, and in one of the pockets, wrapped in a pink tissue, was a ring set with a large stone and numerous unset smaller stones. The detective officers took the defendant and the recovered property to the office of the chief of detectives. The furs and jewels were identified at the trial as property stolen from the Johnson home.

The loose stones found in the Mercury consisted of two large emerald-cut diamonds, two large round-cut diamonds and about 330 small diamonds. The small stones weighed a total of about 18 carats and the larger stones about two and one-half to three carats each. The total value of the loose stones was estimated at $18,000.

Shelton Loeper, the owner of the filling station, testified that the defendant, accompanied by another person not further identified, drove the 1955 Mercury to the filling

station between 8:00 and 9:00 a. m. on the morning of November 21st. When the car was driven in there was a state license plate on it. The keys were left in the car because it was put on the wash rack and thereafter moved to the rear of the station.

On November 23, 1955, police officers searched the defendant's home pursuant to a search warrant and in a bureau drawer found two small diamonds about ⁹⁄₁₀₀ths of a carat in size, wrapped in tissue, and estimated to be worth $15 to $18 apiece. A diamond expert testified these stones were similar to some of the loose diamonds recovered in the trunk of the Mercury, but also testified they were similar in size and shape to millions of other diamonds in existence in the United States. At the time the search was made Sergeant Grimes saw in the rear of defendant's home the Mercury automobile which he identified as the one from which the stolen property was recovered.

On November 11, 1955, Jewel Harris, accompanied by her husband, borrowed from A. & L. Dunn Company the sum of $4,750, pledging as security three articles of jewelry not connected with the burglary. Jewel Harris was alone on November 21, 1955, when she repaid the loan with interest. The currency use to repay the loan and interest was identified by its serial numbers as part of the money secured from the Boatmen's Bank and given to the defendant for use in recovering the stolen property.

The defendant presents for review 17 allegations of error. The first and the third have the same basis. The defendant first attacks the sufficiency of the indictment on the ground that it fails to allege that he received the stolen property with an intent to defraud. He further contends the state's main instruction is reversibly erroneous for failure to submit the issue of intent to defraud.

The indictment in substance charges the defendant and his co-indictees with the offense of "feloniously and fraudulently" buying and receiving the stolen jewelry and furs of the value of more than $50 "well

knowing the said goods and personal property to have been feloniously stolen, taken and carried away, with the felonious intent on the part of the thieves * * * to permanently deprive the owners of the use thereof." The state's main verdict-directing instruction generally followed the language of the indictment, employing the term "fraudulently and feloniously" which are words with which we are immediately concerned.

Section 560.270, prior to its amendment in 1955, provided: "Every person who shall buy, or in any way receive, any goods, money, right in action, personal property, or any valuable security or effects whatsoever, * * * that shall have been stolen from another, knowing the same to have been * * * stolen, shall, upon conviction, be punished * * *."

Under the foregoing statute the gravamen of the offense was that the property had been stolen and the defendant received it knowing it to have been stolen; further intent was not an element of the state's case. State v. Ebbeller, 283 Mo. 57, 222 S.W. 396, 398 [2]; State v. Cohen, 254 Mo. 437, 162 S.W. 216, 219 [3]; State v. Batterson, Mo., 274 S.W. 43, 46 [5]; State v. Smith, 250 Mo. 350, 157 S.W. 319, 323 [3]. A contention that the defendant received the property for lawful purpose such as an intent to return it to the owner was a matter of defense. State v. Powers, 255 Mo. 263, 164 S.W. 466, 467 [1]. This was a departure from the common law, and Missouri was one of the few states in which an intent to defraud was not a constituent element of the statutory offense. State v. Sakowski, 191 Mo. 635, 90 S.W. 435, 438 [1]; State v. Powers, supra. See, also, 76 C.J.S. Receiving Stolen Goods § 9a, p. 16, and 53 C.J., Receiving Stolen Goods, § 23, p. 512.

By the amendment effective August 29, 1955, intent to defraud was made an essential element of the offense of receiving stolen property. Section 560.270, as in effect in November, 1955, the time of the alleged offense, provided: "Every person who shall

buy, or in any way receive, *with intent to defraud,* any property that shall have been stolen from another, knowing the same to have been stolen, shall, upon conviction, be punished in the same manner and to the same extent as for the stealing of the property so bought or received." See Laws of Missouri, 1955, p. 509, § 1. The change important to the present inquiry is the inclusion of the italicized phrase "with intent to defraud."

■ A defendant's constitutional right to demand the nature and cause of the accusation against him means that he must be definitely informed as to the nature of the charge so that he may prepare his defense and so that the proceedings, when determined, will constitute a complete bar to another prosecution for the same offense. Art. I, §§ 18, 19, Const. of Mo., 1945, V.A. M.S.; State v. Stringer, 357 Mo. 978, 211 S.W.2d 925, 929 [8].

■ Charges of a criminal indictment or information should be pleaded with definiteness and certainty, and nothing of substance should be left to intendment or implication. State v. Herndon, 339 Mo. 283, 96 S.W.2d 376, 379 [2]; State v. Stringer, 357 Mo. 978, 211 S.W.2d 925, 929 [9]; State v. Barnes, 281 Mo. 514, 220 S.W. 848, 849 [1].

Where "the common law or statute makes a particular intention essential, * * *, it is necessary to allege the intent with directness and precision, * * *." 42 C.J.S. Indictments and Informations § 134, p. 1025. See, also, State v. Hardy, 359 Mo. 1169, 225 S.W.2d 693, 696 [4]; State v. McCollum, 44 Mo. 343, 345; and § 545.170 RSMo 1949, V.A.M.S.

■ The state concedes that the amendment had the effect of adding to the offense the element of intent to defraud, and that such intent must be alleged in order for the indictment to charge the offense sufficiently, but contends that the averment need not be in the exact language of the statute. Where a statute defines the criminal offense and sets forth all of its elements, the better practice is for the indictment to follow the language of the statute, but an indictment will not be held insufficient for failure to do so if words of similar import are employed. State v. Carter, Mo., 64 S.W.2d 687, 688 [1]; State v. Harroun, 199 Mo. 519, 98 S.W. 467, 470; State v. Privitt, 175 Mo. 207, 75 S.W. 457, 462. Seeking to bring itself within this rule the state contends that the words "feloniously and fraudulently," as used in the indictment, are sufficient to charge that the defendant received the property with intent to defraud.

■ The word "felonious" is generally employed to classify offenses and is not a distinct element of the crime. It is descriptive of the grade of the offense rather than the criminal act which constitutes the offense. State v. Spray, 174 Mo. 569, 74 S.W. 846, 847; State v. McLain, 159 Mo. 340, 60 S.W. 736, 740; State v. Barton, 142 Mo. 450, 44 S.W. 239, 240. Clearly the alleged defect in the indictment is not aided by the use of this generic term.

The state strongly urges that the charge that the defendant "fraudulently" bought and received the stolen property is substantially equivalent to the statutory requirement that the property must be received "with intent to defraud," relying chiefly upon Isaacs v. State, 7 Ga.App. 799, 68 S.E. 338; State v. Noland, 111 Mo. 473, 19 S.W. 715, 717; and State v. Probert, 19 N.M. 13, 140 P. 1108, 1109. The Isaacs case [7 Ga.App. 799, 68 S.E. 339] involved a charge of cheating and swindling the prosecuting witness by means of representations "knowingly, falsely, and fraudulently made." The court held, 68 S.E. 339: "If the statements made were fraudulent, they must have been made with intent to deceive and defraud." In the Noland case it was charged that a state treasurer "did unlawfully, fraudulently, and feloniously convert to his own use and embezzle" certain public money. The averment was substantially in the language of the statute. The court stated, 19 S.W.

717: "But in this case the pleader charged the conversion to have been unlawful, willful, fraudulent, and felonious. These words must be held to be tantamount to and synonymous with the words 'with intent to defraud,' and to meet every requirement of the allegation of criminal intent, *if it was necessary to charge the intent,* in addition to the other averments, *but we do not think it is.*" (Italics added.) Since the court took the view that an allegation of intent to defraud was not necessary, the statement relied upon is obiter dictum. The Noland case was followed and applied in the Probert case under practically identical circumstances; that is, the statement was unnecessary to the decision. These cases, in which the fraudulent statement or act was the thing condemned, fail to reach the sort of intent with which we are concerned. They are not controlling or persuasively decisive of the question before us.

On the other hand, in State v. Reinke, Mo., 147 S.W.2d 464, 465 [2], where the word "fraudulently" was used in an instruction in a first degree robbery case, the court held: " 'Fraudulently' as used in the instruction refers to the doing of the act knowingly and purposely, not accidentally or by mistake." Webster's New Int. Dictionary, 2d Ed., defines the adjective "fraudulent" as: "1. Using fraud; tricky; deceitful. 2. Characterized by, founded on, or proceeding from, fraud; of the nature of fraud. 3. Obtained or performed by artifice." The use of the adverbial form would carry with it the idea that an act was performed by means of fraud, artifice, trick or deceit. Such means might be unlawful but not inconsistent with an intent to return to its owner property so obtained.

■ In the same dictionary "defraud" is defined as: "To deprive of some right, interest, or property, by deceit; to cheat; as, to *defraud* a servant, a creditor, the state;—with *of* before the thing taken or withheld." "Intent" is the purpose or design with which an act is done. State v. Logan, 344 Mo. 351, 126 S.W.2d 256, 260 [13]. An intent to defraud indicates a purpose or design to deprive someone of a lawful right, interest, or property by fraudulent means and is inconsistent with an intent to return the property to its owner.

■ Under the present statute the offense of receiving stolen property connotes receiving such property, knowing it to have been stolen, and with a purpose or design to deprive someone of a lawful interest or property right therein.[1] The intent or purpose in receiving the property which, prior to the amendment, the defendant was obliged to bring forward as an affirmative defense in order to exculpate himself, has now been made a constituent part of the state's case. A person might receive stolen property fraudulently, that is, knowingly and purposely and by fraud, artifice or deceit, and still not have committed the crime proscribed by the present statute. He might, for example, obtain possession of the property by fraudulent means such as pretending to aid the thief, and yet not be guilty of the criminal act if his intent was to restore it to the person entitled.

■ In the circumstances of this case we are constrained to hold that the words "feloniously and fraudulently" are not of similar import to the statutory term "intent to defraud." The allegation is not sufficiently definite and certain to satisfy constitutional and statutory requirements. State v. Herndon, 339 Mo. 283, 96 S.W. 2d 376; State v. Krebs, 336 Mo. 576, 80 S.W.2d 196. As previously noted, this fatal deficiency cannot be supplied by in-

---

1. Sec. 545.170 RSMo 1949, V.A.M.S., provides: "It shall be sufficient in any indictment for any offense where an intent to * * * defraud shall be necessary to constitute the offense, to allege that the defendant did the act with such intent, without alleging the intent of the defendant to be to * * * defraud any particular person; * * *."

tendment or implication. The question of defendant's intent might well have been a very important jury issue and perhaps, under the evidence, the very crux of the case. Affecting as it did the substantial rights of the defendant, it was not cured by the statute of jeofails. Sec. 545.030 and 42 V.A.M.S.Sup.Ct.Rule 24.11.

█ This fatal defect was carried over and made more apparent in the state's Instruction No. 3, which generally followed the language of the indictment. "The basic function of an instruction is to aid the jury to apply the law as declared by the court to the facts in evidence. And the instructions must cover such legal principles, applicable to the evidence, which are necessary for the jury to apply to reach correct conclusions on submitted issues." State v. Bartlett, 359 Mo. 881, 224 S.W.2d 100, 104 [7]. Whether requested or not, the trial court is required to instruct on all the law of the case, which means all of the essential elements of the offense. Sec. 546.070(4); State v. Harris, 232 Mo. 317, 134 S.W. 535, 536 [2]. The state's instruction, purporting to cover the entire case and authorizing a conviction upon the facts hypothesized, should have required the jury to find every fact necessary to constitute the essential elements of the crime charged. State v. Griggs, 361 Mo. 758, 236 S.W.2d 588, 592 [7]; State v. Stewart, Mo., 29 S.W.2d 120, 122 [2].

█ Where an indictment has been held fatally defective, other allegations of error based upon matters occurring at the trial, such as the sufficiency of the evidence, the giving or refusal of instructions, the admission or exclusion of evidence and argument to the jury, will not be examined because, without a valid indictment, these questions are no longer live issues and any discussion of them would amount to nothing more than obiter dictum. State v. Herndon, 339 Mo. 283, 96 S.W.2d 376, 379 [3]; State v. Crayne, Mo., 216 S.W. 47 [2].

In the Crayne case this court stated: "Since there is no sufficient information in

the case, it becomes at once apparent that we are left without a proper standard to measure the sufficiency of the evidence, or to pass upon the relevancy of admitted testimony. Neither can we foreknow the contents of a new information, if the prosecuting officer should find it advisable to proceed further in the case. That being true, any discussion of the other points raised would necessarily be based upon a supposed, or hypothetical, case, and would rise to no higher standard than mere dictum. For that reason we decline further discussion of the case."

This is not to say, however, that the criticisms made in the other assignments should not be noticed by the state and, where justified, be avoided in the event of another trial.

The judgment is reversed and the cause remanded.

EAGER, J., and ELMO B. HUNTER, Special Judge, concur.

LEEDY, J., not sitting.