Lonnie Ray **FRANKLIN**, Movant-Appellant,

v.

**STATE** of Missouri, Respondent.

No. 57455.

Supreme Court of Missouri,
Division No. 1.

Nov. 12, 1973.

Henry C. Hughes, Lusser, Hughes & Lusser, St. Louis, for movant-appellant.

John C. Danforth, Atty. Gen., Richard Paden, Asst. Atty. Gen., Jefferson City, for respondent.

WELBORN, Commissioner.

Appeal from denial of relief in proceeding under Rule 27.26, V.A.M.R. to set aside judgment and sentence of life imprisonment, entered on jury verdict finding Lonnie Ray Franklin guilty of murder in the first degree.

Franklin was convicted in the shooting death of James Riehl, outside Sir L. Roy's Lounge in St. Louis in the early morning hours of January 31, 1970. Franklin had met two friends, James Bowlin and James Sattel at the lounge. Franklin and Bowlin played pool with Riehl. At the conclusion

of a game between Riehl and Bowlin, an argument arose which resulted in physical encounter in which Riehl, who was 5'10" tall and weighed between 220 and 250 pounds, threw Bowlin to the floor. The proprietor of the lounge, Leo Roy, and Riehl's friend, David Vitale, separated the two men. Roy ordered Franklin and his companions out of the lounge. Riehl attempted to get away from Vitale and came toward Bowlin. Bowlin picked up a cue stick and swung it, breaking the cue stick and a lamp. Roy again ordered the three to leave and they did so. According to Vitale, Franklin said to him several times, "Let him go, let him come outside."

Vitale testified that he and Riehl remained in the lounge a few minutes while he calmed down Riehl. He left with Riehl to take him home. When the two went out the front door of the lounge, Franklin appeared and said, "Don't come any closer. I am going to shoot you." Vitale stated that Franklin was pulling a pistol from his pocket and put a bullet in the chamber. Vitale yelled at Riehl, "Jim, he's got a gun" and jumped back. He ran back toward the door and as he did a shot was fired and Riehl fell.

Roy testified that three to eight minutes after Franklin and his companions left, he looked out the window and saw Vitale and Riehl on the sidewalk, facing Franklin. Roy stepped outside and Vitale hollered, "He's got a gun" and knocked Roy against the wall. Roy turned and saw Franklin with a gun and Riehl falling off the sidewalk into the gutter.

Riehl died from the wound he received.

Franklin and his two companions testified in Franklin's behalf. Their version generally was that after the scuffles in the bar, Roy followed them outside, talking about payment for the broken lamp. Riehl and Vitale came out and Riehl charged at Franklin and started striking him. Franklin testified that, as he left, an unidentified friend at the bar handed him a pistol and said, "You are going to need this." Ac-

cording to Franklin, when Riehl started attacking him, he started backing up.

"* * * I put my hand in my pocket because he was swinging at me and hitting me, and I pulled the gun out and I was trying to scare him, and he pushed me back up like this, and he kept swinging, he kept shoving me over and everything, and all of a sudden, all I knew, I slipped off the edge of the curb, and at the same time the gun went off."

The trial court submitted a self-defense instruction and the jury returned a verdict of guilty. A motion for new trial was filed and overruled. Franklin was sentenced to life imprisonment. on January 6, 1971.

Franklin's 27.26 motion was filed March 23, 1971. A hearing on the motion was held in October, 1971, and findings of fact and conclusions of law were made, adverse to the movant.

On this appeal, three grounds, generally speaking, of relief are urged: 1. Ineffective assistance of counsel. 2. Misconduct of the prosecutor. 3. Denial of right to appeal.

I

Ineffective Assistance of Counsel

Franklin was represented from the outset by employed counsel, Mr. William R. Murphy, who had been admitted to the bar in 1957. Murphy had been on the staff of the circuit attorney's office for 2½ years and was familiar with criminal law practice. Four specific charges of ineffective assistance of counsel are relied upon by appellant.

■ First, he charges that Murphy failed to read the post-mortem examination report which showed that the bullet which killed Riehl entered around his eye, or that if he did read the report, he failed to appreciate its significance as it related to the issue of self-defense. Since the facts on this complaint also involve other conten-

tions here advanced, they require some detailed statement.

In his opening statement to the jury, Assistant Circuit Attorney Chancellor stated, among other things:

"* * * Dr. Criscione will tell you the bullet entered the back of Mr. Riehl's head and almost penetrated the eye, but came to a final resting place just inside the eye, pushing it out, but Mr. Riehl was shot in the back of the head. The evidence will show that he was turning to go back in the bar to get away from the man with the gun and in the process he was shot in the back of the head."

Murphy, on behalf of the defendant, stated, in part:

"* * * Lonnie Franklin was standing at the edge of the curb, and as he will testify himself, and he will tell you, yes, he did have a pistol, and he will tell you he was scared of this man because of his size and because of the way he looked. He will tell you the curb is about eight to twelve feet wide and that this man broke away, broke away from the group, the two people who had him, Vitale and Roy, and lunged forward to him and began to hit him with his fists. He hit him at least once and swung at him several times. They were standing on the curb there at Grand Avenue. At this time Lonnie Franklin brought the pistol around to swing, and it came around and hit the back of James Riehl's neck, and the pistol went off, and then Mr. Riehl fell into Grand Avenue."

The state called Doctor Criscione who performed an autopsy on Riehl for the coroner. Doctor Criscione testified on direct examination that Riehl's death was caused by a bullet which entered Riehl's left eye and was found embedded in his skull. Doctor Criscione's post-mortem examination report which included these findings was introduced in evidence.

Subsequently, the state called as a witness, Officer Mancuso of the St. Louis Police Department, who had gone to the scene of the shooting shortly after it occurred, but after Riehl had been removed, and who subsequently saw Riehl's body at the morgue. Mancuso testified to finding a spent .25 caliber shell in the street within inches of a silhouette which police officers had placed on the street to indicate where Riehl had been found. The following questions were asked by the assistant circuit attorney and answered by Mancuso:

"Q. * * * Have you, in your experience as a homicide officer, have you viewed other persons who had bullet wounds?

"A. Yes, I have.

"Q. Do you have an estimate of how many?

"A. I would say between a hundred and two hundred.

"Q. In your experience as a police officer, and based upon your experience as a homicide officer, and based upon your viewing of the—now don't answer this right away—based upon your viewing of the skull of the deceased, did you form an opinion as to where you thought the bullet entered?

"A. I did.

"Q. Where do you think that the bullet entered, based on your experience, and from what you saw?

"A. The lower back of the head.

"Q. Is that what you so indicated?

"A. Yes, it was."

In his final argument, Chancellor stated:

"* * * Now, as stated in the opening statement, is it the truth the way it happened, as Mr. Murphy told you? He is not committed to anything and never will be, the defense never was until Mr. Murphy made an opening statement, and I think that caught some of you by total surprise. If you will recall he told you he was shot in the back of the head and the bullet was in here (indicating). He

couldn't have been more wrong. It is just exactly the opposite. Everybody thought it was that way until the Coroner came in, including the defendant, and you will recall —I had the reporter type this last night. I wanted it word for word what was said in the opening statement about the shooting.

\* \* \* \* \* \*

"This was part of the opening statement made prior to the time he knew what we know now. We were both surprised. Now, do you recall, he said to you, and I'm reading, starting at 'that this man broke away, broke away from the group, the two people who had him, Vitale and Roy, and he lunged forward to him and began to hit him with his fists and hit him at least once and swung at him several times. They were standing at the curb of Grand Avenue. At this time Lonnie Franklin brought the pistol around to swing, and it came around and hit the back of James Riehl's neck, and the pistol went off, and then Mr. Riehl fell into Grand Avenue.'

"Now, where is the truth?"

Murphy testified that he had seen the post-mortem examination report before the trial and was familiar with what it said about the course of the fatal bullet. He stated that he was aware that the prosecutor's opening statement did not properly present the examining physician's report, but that he made no issue of the discrepancy because he was trying to raise a reasonable doubt in the jury's mind as to his client's guilt and felt that a discrepancy between the prosecutor's statement and the evidence would be helpful for such purpose.

The trial court's findings on this issue are not stated as clearly as might be desired. The court found no evidence that counsel failed to prepare for trial or was lax or negligent in the trial. The court further found that movant "was afforded effective assistance of counsel who possessed, at least, a reasonable degree of professional skill, and his representation of defense (sic) was not below the standard."

Inasmuch as the only evidence on appellant's first complaint here, that trial counsel had not read the report of post-mortem examination prior to trial came from trial counsel who testified that he had read the report, and the trial court indicated no disbelief of such testimony, the trial court obviously accepted such testimony in arriving at its conclusion regarding effective assistance of counsel.

▬ Trial counsel's explanation of the course which he pursued was also before the trial court. That course was a matter of trial tactics. The fact that the tactics did not produce the result desired by movant does not demonstrate that he was denied his constitutional right to assistance of counsel. State v. Brown, 461 S.W.2d 743, 746 [2, 3] (Mo.1971); State v. Cook, 440 S.W.2d 461, 466 [9, 10] (Mo.1969); Schaffer v. Swenson, 318 F.Supp. 51, 53 [1] (E.D.Mo.1970).

Appellant cites the failure of his trial counsel to object to the testimony of Officer Mancuso regarding the course of the bullet as evidencing denial of his right to effective assistance of counsel. Trial counsel was not asked on the 27.26 V.A.M.R. about this matter specifically, but it is obvious that his course in this regard was a part of his trial strategy to have the state produce conflicting testimony on this question.

Another matter relied upon by movant was the failure of his trial counsel to obtain and make use of a police department laboratory report which showed a quantitative blood alcohol analysis performed on a specimen of blood removed from Riehl showed that it contained 0.12% alcohol. When a copy of the report was produced at the 27.26 hearing, trial counsel stated that he had not seen the report previously. Appellant now contends that this report could have provided evidence that Riehl was intoxicated at the time of the shooting. However, appellant does not suggest how the lack of such evidence at the trial was prejudicial to his defense. There was

evidence that Riehl had been at the lounge for some time and that he had drinks there. There was no testimony offered to show that he was intoxicated, but absent some showing as to how evidence of that fact might have assisted movant, the failure of trial counsel to have discovered and used the laboratory report does not show that movant did not receive effective assistance of counsel. Furthermore, appellant has not here demonstrated that the report would have established that Riehl was under the influence of alcohol.

The final ground of claimed ineffective assistance is that counsel did not file a "proper motion for a new trial." Such a motion was filed. Appellant makes no effort to support his general allegation and this court is not obliged to search the record to determine what, if any, basis exists for this contention.

## II

### Misconduct of Prosecutor

■ Appellant charges the prosecutor with the knowing use of false testimony by Roy relating to his whereabouts immediately prior to the shooting. Roy testified that he followed the three persons whom he evicted from the lounge and then went back inside before Riehl and Vitale left. At the 27.26 V.A.M.R. hearing, movant produced a witness who did not testify at the trial and who had been located as the result of a newspaper advertisement. The witness testified that he had started to go to the lounge at the time in question and had parked his auto a short distance away when he saw three men leave the tavern, followed by a fourth man who was "screaming and yelling" and then two men, one of them heavyset, came out. The heavyset man went toward one of the first three swinging and they started to fight and he heard a shot. He was unable to identify any of the persons whom he saw.

This testimony does contradict Roy, but that fact alone fails to demonstrate the requisite knowledge on the part of the prosecutor that Roy's testimony was false. See State v. Moore, 435 S.W.2d 8, 16 [14, 15] (Mo. banc 1968). The trial court found that the prosecutor did not knowingly use false testimony and that finding has not been shown to have been erroneous in this regard.

■ Appellant contends that the prosecutor used non-factual testimony in presenting the opinion testimony of Officer Mancuso that the bullet entered the back of Riehl's head, after the post-mortem examination report had showed that the bullet entered in Riehl's eye.

As explained by the prosecutor who testified on the 27.26 V.A.M.R. hearing, this was a face-saving tactic he adopted after he was surprised to learn that the post-mortem report showed that the bullet had entered at the eye of the victim. Apparently the police report, not here filed, was consistent with the officer's testimony. While the tactic is to be condemned, there is nothing which indicates that the prosecutor used such testimony other than as explanation for or vindication of his opening statement. In no other manner did the prosecutor attempt to advance or support his opening statement to the effect that Riehl was shot in the back of the head and he in effect acknowledged his error in that regard in his closing argument.

The case of State v. Scott, 479 S.W.2d 438 (Mo. banc 1972), relied upon by appellant, is not here applicable. That case dealt with the failure of the trial court to order the production for inspection by defense counsel of a detective's notes of an oral conversation with the defendant, in a case in which the detective testified at length to admissions of the defendant in the course of such conversation. Such situation is far removed from that here.

■ Appellant also contends that the prosecutor was guilty of misconduct and unprofessional acts in stating in his opening statement that the evidence would

show that Riehl was shot in the back of the head. The trial court found on this issue that the prosecutor had either failed to review the post-mortem report or had relied upon the police report and that the confusion on the issue was the result of discrepancy between the two documents. Under all of the circumstances, the trial court's finding is not clearly erroneous.

■ The final attack upon the prosecutor's conduct is based upon his alleged suppression of the laboratory report, above referred to, which showed that Riehl had an alcohol blood level of 0.12%. The trial court made no finding on the charge that the prosecutor had withheld the report from defense counsel. Trial counsel had not seen the report prior to the 27.26 V.A. M.R. hearing. The prosecutor acknowledged that he had a copy of the laboratory report in his file, but had no recollection of whether or not he called its contents to the attention of the defense counsel. There is no evidence of suppression of the report by the prosecutor and, in no event, has appellant demonstrated that the laboratory report is of such significance that its suppression would bring into play the rule upon which appellant relies. Malone v. State, 461 S.W.2d 727, 730–731 [4] (Mo. 1971); see State v. Thompson, 396 S.W.2d 697 (Mo. banc 1965).

### III

### Denial of Right to Appeal

Appellant's father employed his trial counsel and paid him $3,000 for his services. Trial counsel stated that, with respect to the appeal, he "never did really understand [his] position, although it was obvious that [his] services were no longer required." He did file a motion for new trial, which was overruled on January 6, 1971, and sentence was imposed, with trial counsel present. Trial counsel did not discuss with appellant his right to appeal as an indigent person.

Because appellant and his father were dissatisfied with trial counsel's efforts, movant's father got in touch with another attorney, Mr. Neil Aschemeyer, shortly after the jury verdict had been returned, with a view of having Aschemeyer handle his son's appeal. Aschemeyer fixed his fee for his services at $7,500, plus $1,000 for expenses. Aschemeyer was paid $3,000 toward his fee and expenses, but prior to the expiration of time for filing notice of appeal, Mr. Franklin concluded that he would be unable to obtain the $5,500 yet required. He spoke to Mr. Aschemeyer who agreed to return $2,000 of the fee. Aschemeyer testified to the termination of his services and appellant's signing of a memorandum waiving his right of appeal, as follows:

"* * * I had a conversation at length with his father and his father in this connection asked me that in the event that I had been in the position to go forward and handle the appeal on his behalf and was successful and the case reversed, and he stood trial again, and were again convicted, if there was any possibility of him being given the death sentence, and I told him that I thought this was highly improbable, but I couldn't say that it wasn't a possibility. After that he said in that event he would not want his son's case appealed under any circumstances. He told me that he wanted to meet with his son and discuss the matter with him first and then that I would talk to him, and we both went over to the City Jail and we met with his son separately. I was not present, and I then went up and spoke with Lonnie Franklin and I told him, and he understood I had just had a visit with his father, and he told me he didn't want me to go forward with his appeal and I had prepared a memorandum in this connection for his directing me not to effect the appeal and to withdraw as his attorney, which he signed."

The testimony of movant and his father was to the effect that their prime concern in the execution of the waiver of right to appeal was in obtaining the refund of the $2,000 of the $3,000 paid Aschemeyer.

The father acknowledged that he did discuss with Aschemeyer the possibility of a death sentence in the event of a new trial and movant testified that Aschemeyer had so advised him.

The trial court made no findings on the appeal issue.

■ On this appeal, the argument of appellant goes only to the point, unquestionably accepted, that an indigent defendant is entitled to the appointment of counsel on appeal. Swenson v. Bosler, 386 U.S. 258, 87 S.Ct. 996, 18 L.Ed.2d 33 (1967) and Douglas v. California, 372 U.S. 353, 83 S. Ct. 814, 9 L.Ed.2d 811 (1963) have clearly established that right.

The waiver problem presents a different question. The matter was considered in Newland v. State, 454 S.W.2d 21 (Mo. 1970), in which the court, at least inferentially, held that a defendant, represented by employed counsel on trial, who was unable to pay such counsel to handle his appeal, would not have made a knowing and intelligent waiver unless the defendant was aware of his right to the assistance of appointed counsel if he was in fact indigent. In that case, the court concluded that the evidence would have warranted a finding that trial counsel did advise the defendant of the availability of assistance from the public defender. See Newland v. Haynes, 445 F.2d 267 (8th Cir. 1971).

In Burnside v. State, 473 S.W.2d 697 (Mo.1971), notice was taken of the differing views among the federal circuit courts as to the obligation of the trial court and of retained trial counsel to advise a defendant of his rights as an indigent person on appeal. In that case, the evidence failed to support a claim of indigency, and the question of waiver was not required to be considered.

■ The basic issue presented is whether or not movant knowingly and intelligently waived his right of appeal, or whether, as the state contends, the decision not to appeal was based solely upon consideration of the possibility of a death sentence upon retrial in the event of a successful appeal. The trial court made no findings on those issues. This court reviews findings of the trial court to determine whether or not they are clearly erroneous. Absent findings by the trial court, there is no basis for review in this court. State v. Rose, 440 S.W.2d 441, 446 [6] (Mo.1969). Therefore, the matter must be remanded to the trial court for findings on this issue. Otherwise, the judgment below should be affirmed.

Judgment affirmed in part; reversed and remanded in part.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

BARDGETT, P. J., HOLMAN, J., and DONNELLY, C. J., concur.

SEILER, J., not sitting.