STATE of Missouri, Plaintiff-Respondent,

v.

Hilmer E. BARNES, Defendant-Appellant.

No. 9486.

Missouri Court of Appeals,
Springfield District.

May 10, 1974.

Rehearing Denied Dec. 16, 1974.

Morton K. Lange, Cuba, for defendant-appellant.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for plaintiff-respondent.

**158**

PAUL E. CARVER, Special Judge.

Hilmer E. Barnes was found guilty by a jury in the Circuit Court of Crawford County of violating § 561.450, RSMo 1969, V.A.M.S., the "Confidence Game" statute. A sentence was assessed against him by the jury for a period of seven years confinement in the penitentiary. From the judgment and sentence he has appealed to this court.

Elizabeth Peterson, age 55, a widow and school teacher, lived alone with her 18-year-old son, Clarence Peterson, about eight miles east of Steelville, Missouri. Her home was in the country and was somewhat off of the public road.

In April of 1970, through a friendship club, she received a letter from Hilmer Barnes. She answered his letter and they corresponded for about three months or until approximately June 1970. There was no other contact or correspondence then until May 1971, except for a phone call she placed to his house during the course of a trip to Iowa. He was not there and she left word to inform him that she called and that she was in Chariton, Iowa, attending a funeral.

On May 6, 1971, about nine o'clock in the evening she received a phone call at her home from Barnes. He said "he had been down this way fishing and would like to come out and see her." She agreed and gave him directions, and about twenty minutes later he came to her house in a car. He came into the house and about 11:30 P.M. he told her his lawyer, John Longall, was in the car. Longall was invited into the house and Barnes introduced him as John Longall, his lawyer, and said that they had been in St. Louis all day working on some papers, that is, getting papers drawn up to buy a motel. A friendly meeting was held and refreshments were served by Mrs. Peterson. Longall drank some coffee and then went into the living room and lay down on the couch. Mrs. Peterson and Barnes were in the kitchen and they stayed there until about one

o'clock or so in the morning talking about many things, that is, just "run of talk" and about what she thought would make a good husband. Sometime before midnight he wanted to know if she would marry him, and somewhere along the line she accepted his proposal. They agreed to get married in June in order for her to finish school as a teacher, and plans were made for a little engagement before they married and Barnes said "he would buy a ring for her."

On Friday morning he told her they were going to St. Louis to fix the final papers for the motel and he said "he wanted to put her name on the final papers so they wouldn't have to redo them after the final deal went through." Mrs. Peterson and her son went to school before Barnes and Longall left. When she returned, Barnes and Longall were in the living room. Barnes said "they had been to St. Louis and it took about fifteen minutes to meet with some kind of board that approves the motel business and that they came back." He also said "they had looked at some rings and furniture and he thought she should sell the old furniture and get new furniture; also, that the motel belonged to his uncle, whose wife had cancer, and was selling the motel." He professed knowledge of the motel business and said he had operated a motel before in St. Louis, and seemed to be well versed in the operation of motels.

On May 8th Barnes approached Mrs. Peterson and asked her where they could talk secretly. They went upstairs and he asked her if she could get her hands on some ready cash; that he needed $6,000 to pay Longall for attorney's fees for drawing up the papers on the motel; that Longall was in a hurry and wanted to go home. He also said he wanted to get married and buy a house; also that he didn't want Longall to know he was borrowing money to pay him. She told Barnes she had $2,000 in the Steelville Bank and some savings in the Central Federal and Loan at the town of Rolla. He said "that would be

all right" and he promised to pay her back with interest in fifteen days.

On the same morning they went to Steelville and drew $2,000 from the bank, which she turned over to him later. They then went to Rolla in Phelps County, where she withdrew $4,000 from her savings account and obtained a cashier's check, which was also turned over to him. The check cleared, bearing the endorsement of Hilmer E. Barnes and Sam Armstrong. Mrs. Peterson and Barnes planned to take Clarence to her brother's in Hillsboro, after going to Rolla, and from Hillsboro to go to the City of St. Louis. They left Clarence at Hillsboro; but after they left her brother's house, Barnes made a phone call to her house and out of Mrs. Peterson's immediate presence. He said "Longall couldn't get his car started and that they had to go back and see about him." Mrs. Peterson thought something was not right and told him that she would fight if she was "taken", but afterwards she apologized for mistrusting him. When they got back to the house, Longall was gone, without leaving a note or anything. Mrs. Peterson continued to wonder where he had gone but Barnes said "forget it." They went into the living room and Barnes asked about buses. Mrs. Peterson found out that one left Cuba at 9:30 P.M. and she drove Barnes to Cuba to catch the bus to St. Louis. They waited in the car until the bus came, and while there, Barnes informed Mrs. Peterson that he would be back Friday. Before he left that night she thought that she had been "taken". Inquiry was made of Barnes by Mrs. Peterson about the name of the motel and the address. He said the name was Skylark Motel and the address was 4600 or 6400 Grand Avenue. Mrs. Peterson testified later that she had written the address down and it was 4600 North Grand. Mrs. Peterson said "she gave him the money in reliance on his promise to pay her back."

On Friday, May 14th, Barnes returned; and when Mrs. Peterson and Clarence returned home from school, Barnes was there but was with another man whom he introduced as Vel Baker. They stayed all night and until after breakfast the next day. That night Barnes took Mrs. Peterson out to dinner alone. After dinner they came back and watched TV until bedtime. The next morning after breakfast when Mrs. Peterson and Barnes were alone in the living room, she requested a statement from Barnes that she had given him the money. He asked her to make up a statement any way she wanted it and that he would sign it. She wrote up the statement in her own handwriting as follows:

"I promise to pay back $6,000.00 that I borrowed on May 8, 1971, with interest within 6 or 7 days to Elizabeth Peterson. The money was (is) drawn from the Community Bank in Steelville, and Central Savings and Loan in Rolla, Mo."

Barnes signed this writing for her on May 15, 1971, and he and Baker left on the same day.

While they were at Mrs. Peterson's, Barnes told her that Longall's car had been broken into while it was in front of her house and that his briefcase had been stolen. Mrs. Peterson did not ask him any questions about the motel although she said she knew at that time there was no Skylark Motel in St. Louis; but she didn't say a word to him about it or ask him for any explanation, but hoped he would return her money. She didn't call the sheriff, although Barnes was right there. She was still giving him the benefit of the doubt that he would pay her back.

On May 19th or 20th she received a letter dated May 18, 1971, from Barnes in which he addressed her as "My Darling Wife" and signed it "your irish Daddy Bing." There was nothing in the letter which indicated that he had changed his mind about marrying her, and he never told her he wasn't going to marry her. He also never told her he was or was not going to pay her back the money she loaned him. The record shows the defend-

ant did not pay the money due Mrs. Peterson.

On May 21, 1971, and before the money was due, she swore out a complaint. That night Mrs. Peterson wrote a friendly letter at the request of the Sheriff of Crawford County and signed it "Love, Elizabeth." Mrs. Peterson had been to the sheriff and told him her story on Wednesday and she wrote the letter for the purpose of misleading him (Barnes) and particularly because she didn't want him to leave the country to avoid prosecution, and also to give him the benefit of the doubt. Mrs. Peterson said "she was trying to trick him a little bit because she suspected that he had already tricked her."

On June 5, 1971, after "Irish Daddy Bing" had been arrested, he wrote Mrs. Peterson a letter. In this letter he was indignant that she had had him arrested on "a fraudulent charge that never even took place." He also threatened to expose her intimate relations with him; that the relations were of such a nature that her career as a school teacher would be ruined. That she and her son would go swimming in "the bottom of a public sewer before the public . . . I will still meet my agreed business oblagation as we agreed only if free to do so as we agreed and only when you with drow your warrant un justified, if, I have to defend myself through the courts of both Iowa and Mo, thats not legal and will file a Lawsuite against you and concerned and oblagations Lawyers are ended your refusal to have this Un justified warrant removed free to complete our agreed Business will tell me your motive is my blood a hate motive and, I will be force to contact a St,Louis attorney, Advice me in the near future, , all love irish Bing . . ."

Mrs. Peterson admitted she had some affection for Barnes and that she was sincere about marrying him and thought he was about her. She denied any intimate relations with the defendant. Mrs. Peterson also testified that the 4600 on North

Grand, where the Skylark Motel was supposed to be located, was in the middle of the Mississippi River, as she had looked it up. Mrs. Peterson further testified that 4600 North Grand and 6400 North Grand Avenue in the City of St. Louis were both in the middle of the river and that she had investigated both addresses, and that there was no Skylark Motel at such address. The jury believed Mrs. Peterson when she denied any intimate relationship with the defendant Barnes, and that she had been defrauded, which it had a right to do.

Edward Boni, a sergeant of the St. Louis City Police Department, was called as a witness by the State. He stated that he had been a member of the Police Department of the City of St. Louis for twenty years and was familiar with Grand Avenue in St. Louis, and that on May 8, 1971, there was no motel called the Skylark Motel on North Grand Avenue. He said he had checked with the "Recorder in the City of St. Louis" and that there was no record of such a motel.

The defendant Barnes' evidence consisted of Exhibit 1, the letter Mrs. Peterson wrote on the same day she filed her complaint, and a stipulation that a warrant was issued for his arrest on that day; that he was transported from the State of Iowa on February 18, 1972, and had been in jail since that time until the time of trial.

This cause was duly submitted to the jury after being instructed by the court. The jury retired and considered the evidence and returned into open court with its verdict. By its verdict the jury found the defendant Barnes guilty and assessed punishment at confinement in the penitentiary for a term of seven years.

From this judgment and sentence the defendant Barnes filed his motion for a new trial and for acquittal. This was denied by the trial judge. The defendant was sentenced in accordance with the verdict of the jury. The defendant has fully perfected his appeal to this court.

The defendant originally assigned nine assignments of error but has preserved only four grounds of error. We shall consider them in the order they should be considered for the purpose of clarity and not necessarily as raised by the defendant.

We shall consider defendant's Assignment of Error Number 2 first, which is:

"The indictment was defective and failed to charge all of the elements of the crime of obtaining money by false pretense under Section 561.450 R.S.Mo., 1969, · or other applicable law."

The First Amended Information in the instant case charges that the defendant Hilmer E. Barnes "at the County of Crawford and State of Missouri, heretofore, to-wit: on or about the 8th day of May, 1971, one Hilmer E. Barnes did then and there wilfully, unlawfully, feloniously and fraudulently obtain from one Elizabeth Peterson, the sum of $2,000.00 lawful money of the United States of America, and of the value of $2,000.00, the goods and chattels of the said Elizabeth Peterson, by then and there falsely and fraudulently representing to the said Elizabeth Peterson that he would marry her, and that he needed said sum of money to close the deal on the purchase of a motel known as the 'Skylark Motel', located at 4600 North Grand, in the City of St. Louis, Missouri, when in truth and in fact, the said Hilmer E. Barnes then and there had no intention of marrying the said Elizabeth Peterson, and in truth and in fact he was not then and there negotiating for the purchase of the Skylark Motel and that all of the said representations were falsely and fraudulently made by the said Hilmer E. Barnes to the said Elizabeth Peterson with full knowledge on the part of the said Hilmer E. Barnes that said representations were false and untrue and that same were made for the sole purpose of obtaining from the said Elizabeth Peterson, the sum of $2,000.00; and that the said Elizabeth Peterson relied upon said representations and was deceived thereby and in reliance thereon was in-

duced to deliver over to the said Hilmer E. Barnes, the sum of $2,000.00, in lawful money of the United States of America, contrary to the form of statute in such cases made and provided and against the peace and dignity of the State of Missouri.

/s/ G. C. Beckham
Prosecuting Attorney"

█ Such an assignment is inadequate and preserves nothing for appellate review. We shall, however, determine this assignment of error because we are required by Rule 28.02, V.A.M.R., to consider the sufficiency of the Information, although not raised in the trial court or preserved for review. This we shall do.

We have determined that the sufficiency of the Information should first be determined. If we should hold that the Information is fatally defective, all other allegations of error based on matters occurring at the trial will not be examined, because without a valid Information, no live issue exists for determination. State v. Cunningham, 380 S.W.2d 401, 402[2] (Mo. 1964); State v. Harris, 313 S.W.2d 664, 671 [9] (Mo.1958); State v. Lee, 488 S.W. 2d 272 (Mo.App.1972).

█ An Information charging the obtaining of property by false pretenses should allege in clear, simple, and positive language all the essential ingredients of the offense with which the accused is charged, with such definiteness and reasonable certainty as to fully apprise the accused of the nature of the accusation against him and enable him to prepare to meet it at his trial, and so that the proceedings, when determined, will constitute a complete bar to another prosecution for the same offense. State v. Harris, supra, 313 S.W.2d at 669[1]; State v. Stringer, 357 Mo. 978, 983, 211 S.W.2d 925, 929 [6–10] (Mo. 1948).

█ The exact words of the statute are not necessary, but it is sufficient if the offense charged is in equivalent words of the same import. Rule 24.11, V.A.M.R.;

41 Am.Jur.2d Indictments and Informations § 90 (1968). The Information must contain the necessary allegations required under § 561.450, RSMo 1969, V.A.M.S., to support a valid charge against the defendant.

■ The information in this case, while not necessarily a model to be followed, does contain all of the necessary elements required by § 561.450, RSMo 1969, V.A.M. S. It alleges: That the defendant Hilmer E. Barnes did then and there wilfully, unlawfully, feloniously and fraudulently obtain from Elizabeth Peterson the sum of $2,000 after representing he would marry her. That he needed the money to close the deal on the Skylark Motel, located at 4600 North Grand in the City of St. Louis, and in truth and fact he was not then and there negotiating for the purchase of the Skylark Motel. That all of said representations were falsely and fraudulently made by Hilmer E. Barnes. That said statements were false and untrue and the same were made for the sole purpose of obtaining from Elizabeth Peterson the sum of $2,000, and that Elizabeth Peterson relied upon said representation and was deceived thereby, and in reliance thereon was induced to deliver to the said Hilmer E. Barnes the sum of $2,000.

■ The Information does not use the phrase, "with the intent to cheat and defraud", but does use "that the defendant did then and there wilfully, feloniously, and fraudulently obtain from Elizabeth Peterson the sum of $2,000.00." The use of the word "fraudulently" is equivalent to an intent to defraud. An intent to defraud indicates a purpose or design to deprive someone of a lawful right, interest or property by fraudulent means. State v. Jarrett, 481 S.W.2d 504, 507[2–3] (Mo. 1972); State v. Garner, 432 S.W.2d 259, 260[2] (Mo.1968); State v. Harris, supra, 313 S.W.2d at 670[5]. The Information states the essence of the offense that the injured party parted with her money in re-

liance upon a false and fraudulent representation. It alleges the essential element of intent to cheat and defraud and defendant's knowledge of the falsity of the representation. It plainly describes an offense defined in § 561.450, RSMo 1969, V.A.M. S., and contains a specification of the transaction with sufficient particularity to enable defendant to know what he is charged with; sufficient in detail to apprise accused of the nature of the alleged deceit, pretense and trick and the cause of the accusation against which he must defend himself. It is clearly sufficient to bar further prosecution for the same offense.

■ Defendant finally complains in his brief that the Information is defective because it "did not adequately inform the defendant" of the nature of the charge against him because it did not use the words "confidence game". The information sufficiently charged an offense under the "Confidence Game" statute. State v. Fields, 366 S.W.2d 462, 467[3] (Mo.1963); State v. Weber, 302 S.W.2d 919, 923[2] (Mo.1957). Defendant's Assignment of Error Number 2 is denied.

In Defendant's Assignment of Error Number 1 he complains and assigns error of the trial court as follows:

"The Court erred in overruling defendant's motion to withdraw the case from the jury and enter a judgment of acquittal at the close of the State's evidence and again at the close of all of the evidence.

"The State's evidence was insufficient to sustain a conviction of the defendant of the charge as made for the following reasons:

"Because the State failed to prove the essential element of its case that the alleged representations were false. Its case rested, therefore, on mere suspicion and conjecture."

In considering this assignment of error the defendant actually complains of the in-

sufficiency of the evidence to support a conviction. With this we do not agree.

Defendant asserts: "In the testing the sufficiency of evidence, the facts will be looked at in their most favorable light to the State, subject to the limitation that the rule requires the consideration of all the facts shown by the State."

 In State v. Sherrill, 496 S.W.2d 321, 323[1, 2] (Mo.App.1973), this court said, "Because of defendant's challenge to the sufficiency of the evidence to support the charge and jury verdict against him it is necessary to detail the evidence relied upon by the state. However, in testing the sufficiency of the evidence the facts and evidence and favorable inferences reasonably to be drawn therefrom must be considered in the light most favorable to the state and all evidence and inferences to the contrary must be disregarded. . . . State v. McClinton, 418 S.W.2d 55 (Mo. 1967); State v. Burrage, 418 S.W.2d 101 (Mo.1967). And the scope of our review extends only to a determination of whether there is sufficient substantial evidence to support the verdict. It is not our function or prerogative to weigh the evidence to determine whether the charge has been proven beyond a reasonable doubt; that is a function of the jury. State v. Strong, supra; State v. Crawley, 478 S.W.2d 344 (Mo.1972); State v. Odum, 353 S.W.2d 708 (Mo.1962)." With the foregoing principles in mind, the jury could reasonably find the facts giving rise to the defendant Barnes' conviction.

The facts are as follows: Mrs. Peterson corresponded with the defendant in 1970 and for about three months. However, in July 1970, the prosecutrix, while in Iowa for a funeral, did attempt to contact the defendant by telephone. She was unsuccessful in this regard but did leave a message to be relayed to the defendant, informing him that she had called and that she was in Chariton for a funeral.

Almost a year later on May 6, 1971, which was a Thursday, "Bing" reestablished contact. He telephoned her home at about 9:00 P.M. and explained that: "I've been down this way fishing. I would like to come out and see you." He arrived at Mrs. Peterson's home within 20 minutes. Around 11:30 or so he announced that he had not come alone but that his lawyer friend was out in the car. At Mrs. Peterson's request defendant brought the lawyer into the house and introduced him as John Longall and explained that the two of them had been in St. Louis all day drawing up papers in connection with the purchase of a motel. The inconsistency of buying the motel and fishing was not explained.

Mr. Longall lay down on the couch in the living room. Clarence, Mrs. Peterson's son, retired to Mrs. Peterson's bedroom and Mrs. Peterson and the defendant were left alone to talk. Sometime before midnight the "Irish blarney" took a serious turn as defendant broached the subject of marriage. Defendant explained why he would make a "good husband", told Mrs. Peterson that he was financially stable; that he had sold his juke box business and his father's farm. However, Mrs. Peterson, hesitating to accept the defendant's offer of matrimony, was informed by the defendant in words to the effect that "if you don't accept the first time, you don't get the second time." Mrs. Peterson agreed to become his wife and accepted defendant's offer of marriage.

Defendant Barnes was given an upstairs bedroom and Mr. Longall remained asleep on the couch. When Mrs. Peterson left for school Friday morning, both were still in bed. She did awaken the defendant and he informed her that they were going to St. Louis to work on closing the motel deal and that he wanted to put her name on the final papers so that they would not have to be redone.

When Mrs. Peterson returned home from school in the afternoon both men were waiting in the living room. The defendant told her that they had gone to St. Louis and that their business was easily disposed of in about fifteen minutes.

That evening Mrs. Peterson and the defendant discussed their upcoming marriage. Mrs. Peterson thought it should be put off until after school was out in June. They planned a "little engagement" and he said that he would buy her a ring. They also discussed the operation of the motel. Mrs. Peterson, in response to her inquiry, was informed that the name of the motel was the Skylark Motel and that it was located on North Grand, across from old Sportsman's Park. Defendant further told her the address but Mrs. Peterson was a little confused; but as she recalled, it was either 4600 or 6400 North Grand. Mrs. Peterson later learned that there was no motel at 4600 North Grand called the Skylark Motel, nor was there one at 6400 North Grand, as both addresses were in the middle of the Mississippi River. The defendant and Longall again stayed the night in Mrs. Peterson's home. On Saturday, May 8th, the defendant called upon Mrs. Peterson for financial aid. Defendant explained that he needed $6,000 to pay a lawyer's fee to Mr. Longall; that Mr. Longall wanted to get married and buy a house. He didn't want Longall to know he was borrowing money to pay him. Mrs. Peterson, after some discussion, agreed to provide the funds, and the defendant promised to pay her back with interest in fifteen days. Mrs. Peterson testified that she relied on this promise.

At defendant's insistence, the money was exchanged that morning. Mrs. Peterson drove the defendant, Clarence, and herself to Steelville, where she withdrew $2,000 from her checking account at the Community Bank. The check was made out to "Cash" and was immediately cashed and Mrs. Peterson received $2,000 in money. She did not hand over the money directly to the defendant. However, after walking around in the business district, they walked through an alley and Mrs. Peterson opened her purse, and the defendant reached in and grabbed the money "like he didn't want anyone to see him."

On the way back to the car the defendant insisted that he wanted to go immediately to Rolla and get the rest of her money. After returning briefly to her home to pick up the passbook, the three of them did journey to Rolla. The Central Federal Savings and Loan Company of Rolla, in Phelps County, wrote out a cashier's check, payable to the defendant Barnes, for the sum of $4,000, and which was delivered to the defendant.

After obtaining the money in Rolla, they proceeded to Mrs. Peterson's home in Hillsboro, Missouri, arriving at about 2:30 in the afternoon. The plans, as previously established, were to leave Clarence at Hillsboro and then the prosecutrix and the defendant would go to St. Louis and look over the motel. As they were leaving, defendant declared that he wanted to call back and check on Longall, who he claimed was having trouble with his automobile. Defendant reported that Longall was unable to get his car started, and he insisted that they return and assist him. How he knew of the car trouble is not shown.

With this information, Mrs. Peterson became disturbed and told the defendant that things weren't right, that she "didn't want to be taken and that she would fight back." Shortly after this statement she calmed down and actually apologized to the defendant for mistrusting him.

Arriving at Mrs. Peterson's home, they found neither Longall or his car. Longall left no note or other indication as to how he was suddenly able to get his car running or why he left in such a hurry. Mrs. Peterson volunteered to phone the Buick garage and inquire as to the fate of Longall and his car; but the defendant, exhibiting a sudden, marked decrease in concern for his friend, advised prosecutrix to "forget about it." He also changed his mind about the St. Louis trip. Instead of having the prosecutrix take him to St. Louis, he went alone on a bus which he caught at 9:30 at night from the town of Cuba, Mis-

souri. The defendant did, however, tell Mrs. Peterson that he would be back the coming Friday.

The defendant did return that Friday, accompanied by one Vel Baker. The two men were waiting in a car when Mrs. Peterson and her son arrived from school. Mr. Longall does not again appear in the transaction or at the trial.

The defendant took Mrs. Peterson out to dinner, but otherwise the evening was uneventful. Both men stayed overnight in Mrs. Peterson's home, and after breakfast the next morning Mrs. Peterson asked the defendant to sign a note to evidence the indebtedness. She composed the writing and he signed it.

Defendant and Vel Baker left around nine the following morning, which was May 15, 1971. The next time Mrs. Peterson saw the defendant was in March 1972 at the preliminary hearing. Mrs. Peterson and the defendant were never married and she has never received any of the money. Defendant did write her twice, one letter dated May 18, 1971, and the other dated June 5, 1971. These letters are described as Exhibits 2 and 3, and were written to dissuade legal action. Exhibit 3 was a passionate love letter in which "Irish Daddy Bing" extolled his ability to make love and that Mrs. Peterson would never be the same without him. Exhibit 2 was a letter of threats to ruin Mrs. Peterson's reputation as a teacher, and of legal action for damages for having him arrested. He did not offer to return the money. In fact, he did not mention the money obtained from Mrs. Peterson.

On May 21, 1971, Mrs. Peterson filed the charge against defendant, and she testified that as of May 15, 1971, she knew there was no Skylark Motel in St. Louis and that she knew she had been "taken" as early as May 8, 1971. In spite of this knowledge, Mrs. Peterson wrote the defendant a nice, sweet letter signed, "Love, Elizabeth" on the 21st. She explained this so as to keep him from leaving the coun-

try, and that the letter was written upon the advice of the sheriff; but in addition, also to give him the benefit of the doubt.

Mrs. Peterson outlined the reasons that she turned the money over to the defendant. She stated that "Because of the letters, the love letters, and because he made love to me, and because of the trust and faith I had in him, that he was buying a motel, I trusted him enough to loan him the money to help pay the expenses for his attorney, Mr. Longall."

From an examination of the record it appears that the defendant did plan and execute a fraud on Mrs. Peterson. That the so-called plan was of so many inconsistent acts, untruths, and subterfuges, it is difficult to understand how Mrs. Peterson could rely on what the defendant said or did; but this is generally a fact in false pretense cases. The fact that Mrs. Peterson relied on the acts and statements of the defendant, and that she was credulous in so doing, is no defense to the charge against the defendant. State v. Smith, 324 S.W.2d 702, 705[1] (Mo.1959).

The defendant's inconsistent statement beginning with the telephone call to Mrs. Peterson saying he was "fishing down this way", then showing up twenty minutes later, and then saying he and John Longall, his attorney, had been working on papers all day to buy a motel; proposing marriage to Mrs. Peterson and wanting to put her name on the papers; obtaining the $6,000 and promising to pay her back in fifteen days, the taking of money from her purse, after taking her up and through an alley, the car trouble that Longall was supposed to have had, and the excuse for not taking Mrs. Peterson to St. Louis; this, in addition to Mr. Longall's car being broken into at Mrs. Peterson's home. Such statements, subterfuges, and acts were all calculated upon the fact that here was a woman 55 years of age, a widow, who had the chance to remarry and believed the "Irish blarney" given her by the defendant. Mrs. Peterson, being in a confidential relationship

with the defendant, relied on it and was defrauded.

Actually, the defendant did not need the money to pay his lawyer to close the motel transaction, and there is no variance in the proof. In fact, the record does not disclose that Mr. Longall was an attorney. Actually, he did not need the money "to close a deal on the Skylark Motel", because none existed.

■ From the above evidence the jury found the defendant guilty; and with this result we agree that there was sufficient evidence to support the defendant's conviction. Defendant's Assignment of Error Number 1 is denied.

Defendant claimed in Assignment of Error Number 3 that:

"The Court erred in permitting the prosecuting attorney to argue the defendant's character to the jury. And in overruling defendant's objection to said argument. And in overruling defendant's motion for a new trial, because of said arguments."

The record does disclose that the following occurred concerning defendant's objection, which referred to his character:

· "MR. BECKHAM: His letter of June 5th contains some of the most vicious—

"MR. LANGE: I object to this argument. It has nothing to do whatever with the charge.

"THE COURT: Overruled.

"MR. BECKHAM: That shows the type of character he is.

"MR. LANGE: I object to that and ask for a mistrial. His character is not at stake.

"THE COURT: He has a right to review the evidence. Of course, what he thinks is not evidence. The jury will be governed by the evidence and not necessarily by what either of the attorneys say.

"MR. LANGE: I object to his reference to the character of the defendant, which is not at issue in this case, and ask for a mistrial and that the jury be instructed to disregard it.

"THE COURT: The request for a mistrial will be denied. If Mr. Beckham is trying to present his character, as such, he should not do it in his argument. Such reference as he may make to the character of the defendant, as shown by the letters, the jury may disregard."

■ The prosecution has the right to review the evidence, which the prosecuting attorney was doing when he referred to and said, "That shows the type of character he is." "Character" has different meanings. Webster, in his "New International Dictionary, Fifth Edition," defines ten different meanings of the word "character". He defines "character" in one sense as a colloquialism, as an "odd or eccentric person." "Webster's New Collegiate Dictionary, Eighth Edition" describes "character" in one sense as "capable of portraying an unusual or eccentric personality . . ." Defendant's letter dated June 5th, which was entered into evidence, certainly presented a reasonable basis for referring to the defendant as a "character" when used in a colloquial sense.

■ In any event, reference to defendant's character was stopped by the trial judge, who admonished the jury to disregard it. The granting of a mistrial should only be granted in extraordinary circumstances. These circumstances should not require such a drastic remedy. State v. Craig, 433 S.W.2d 811, 814[2] (Mo.1968); State v. Nolan, 423 S.W.2d 815, 818[11] (Mo.1968); State v. Wintjen, 500 S.W.2d 39, 42[1] (Mo.App.1973).

As each case must be determined in the light of that particular case, we find that such a remark of which defendant complains, did not prejudice his defense. Assignment of Error Number 3 is denied.

Defendant claims in Assignment of Error Number 4 that:

"The Court erred in giving and reading to the jury Instruction No. 4 because:

"(a) Said instruction was broader than the information and broader than the evidence, and was not supported by the evidence. The instruction permitted the jury to find that the defendant obtained money from the prosecutrix to pay an attorney for 'closing a deal' on the purchase of the motel. The information charged that the defendant obtained the money 'to close the deal on the purchase of the motel.' The evidence showed that the defendant obtained the money to pay legal fees for drawing up the papers and 'helping' with the deal on the motel."

The variance between the jury's instruction reciting "defendant obtained money from the prosecutrix to pay an attorney fee for closing a deal" on the purchase of the motel and the Information charging that "the defendant obtained the money to close the deal on the purchase of the motel" is not material. It is not necessary that the language be precisely the same. All that is necessary is that the "idea and concept" conveyed by the defendant to Mrs. Peterson be identical. Such a variance as complained of herein is not fatal or prejudicial to the defendant's defense, State v. Jarrett, supra, 481 S.W.2d at 509[9–11], and a variance is not fatal unless the variance was material to the defense of the defendant. State v. Smith, 252 S.W. 662, 665[6] (Mo.1923).

The whole idea was that the money was to be spent in connection with the purchase of the motel. The record discloses a technical variance, as heretofore set out, but it is immaterial and harmless. State v. Jarrett, supra, 481 S.W.2d at 509. Defendant further complains that Instruction Number 4 told the jury that "if appellant made representations, these were false." An examination of Instruction Number 4 does not contain such an error. The instruction fully complies with the requirements of § 561.450, RSMo 1969, V.A.M.S., and is in harmony with the Information. No error appearing, defendant's Assignment Number 4 is denied.

The matters for which no assignment of error is required have been examined, as required by Rules 28.02 and 28.08. The Information is sufficient and in proper form. The defendant stood trial upon his plea of not guilty. The jury's verdict is in proper form and responsive to the issues. The punishment assessed was within the range provided by statute. Defendant's motion for a new trial was considered by the capable trial judge and denied. Allocution granted. Defendant had the benefit of competent counsel throughout his trial and upon his appeal. No error appearing from the record, the judgment is affirmed.

All of the Judges concur.

### On Motion for Rehearing

PER CURIAM.

This cause was submitted to this court at its January 1974 session at Springfield. On May 10, 1974, the principal opinion was adopted without dissent and was thereafter published. On May 21, 1974, defendant filed a timely pro se motion for rehearing stating that he sought a "re-hearing [sic] of the opinion" and requesting appointment of new counsel of record on the ground that his attorney had been appointed Prosecuting Attorney of Crawford County, Missouri, "[a]nd thus must withdraw as counsel of record." Shortly thereafter, in a lengthy and explicit letter, defendant's court-appointed counsel advised this court that he had indeed been appointed Prosecuting Attorney of Crawford County, and that he believed his further representation of the defendant would constitute a violation of § 56.360, RSMo 1969, V.A.M.S., and a serious breach of legal ethics as well. On June 13, 1974, we acknowledged receipt of Mr. Lange's letter, advising him

that we would regard the motion for rehearing as timely filed and subject to amendment. We further advised Mr. Lange that we would defer action on the motion and take time to consider the law involved.

At this point, two general questions seemed to be presented: a) whether an order refusing to permit counsel to withdraw would require him to commit a positive violation of § 56.360, or at least constitute a breach of ethics which might later be raised in a post-conviction proceeding, and b) whether or not the defendant was, at this stage of the proceeding, entitled to court-appointed counsel either as a matter of local law or of federal constitutional right.

The first question—as presented—seemed beyond our competence to decide. We therefore requested the advice of the General Chairman of the Bar Committees, appointed pursuant to Rule 5.01, V.A.M.R., and the Advisory Committee. The General Chairman gave as his informal opinion that counsel's further representation of the defendant might well appear, and probably would be, improper. Mr. Lange was thereupon given permission by this court to withdraw as counsel of record.

The more fundamental question remained: Was the defendant entitled to appointed counsel solely for the purpose of pursuing his motion for rehearing? Neither the applicable rule, Rule 29.01(c), V.A.M.R., nor the case law, e. g., Franklin v. State, 501 S.W.2d 166, 173[7] (Mo.1973), quite reached that question. The rulings from the federal courts appeared to be in conflict, but the latest ruling, Moffitt v. Ross, 483 F.2d 650 (4th Cir. 1973), indicated that the defendant had a federal constitutional right to the assistance of appointed counsel in seeking a rehearing here and in applying to the Supreme Court of Missouri for discretionary review. We noted that certiorari had been granted in the *Moffitt* case, 414 U.S. 1128, 94 S.Ct. 864, 38 L.Ed. 2d 752 (1974), and awaited the decision of the Supreme Court of the United States.

In Ross v. Moffitt, 417 U.S. 600, 94 S. Ct. 2437, 41 L.Ed.2d 341 (1974), the Supreme Court of the United States undertook to decide whether Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), which requires appointment of counsel for indigent state defendants on their first appeal as of right, should be extended to require counsel for discretionary state appeals. We undertake no judicial gloss on the court's decision, but as we read the opinion, it was held that if an indigent defendant has had the assistance of counsel in presenting his claims of error upon his appeal of right in a multi-tiered appellate system such as ours, he has no federal constitutional right to the assistance of counsel in seeking discretionary review in the highest court of the state.

With this decision in mind, we advised the defendant to apply to the trial court for the appointment of counsel to assist him in seeking a rehearing in this court, since under Rule 29.01(d), V.A.M.R., it is the trial court's duty to appoint new counsel if appointed counsel is permitted to withdraw upon appeal. The defendant made no new showing of indigency, and the trial court refused to appoint new counsel unless so ordered by this court. Whether such an order should issue must be considered in light of present practice in criminal appeals in this state. We assume, though no such proof appears, that the defendant is still indigent.

One factor to be considered in determining defendant's right to appointed counsel at this stage of the proceeding is that under our present criminal practice, the indigent criminal defendant, on his appeal of right to the Court of Appeals, receives a review of his claims of error more extensive than that to which he is entitled as a matter of federal constitutional right. An indigent criminal defendant is entitled to a free, full and complete transcript of the trial proceedings even though he appears only to plead guilty. § 485.100, RSMo Supp.1971, as supplemented by order of the Supreme Court of Missouri dated February

22, 1972. Moreover, in this state, criminal appeals may not be disposed of in the manner outlined in Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), although a very hasty search indicates the *Anders* procedure is now routinely used to dispose of wholly groundless appeals in the United States Court of Appeals for the Fifth Circuit, in Florida, Illinois, Nebraska, South Carolina, Texas and Utah.[1] In State v. Gates, 466 S.W.2d 681 (Mo.1971), our Supreme Court felt obliged to reject the *Anders* procedure, and instead incorporated into the case law the requirement suggested by the commentary upon A.B.A. Standards, The Prosecution Function and The Defense Function, § 8.3(b), pp. 295–302 (Approved Draft 1971). Counsel for the indigent criminal defendant is therefore required upon the defendant's appeal of right to present "all there is to present" including such points as the defendant desires to have raised, provided counsel can do so without compromising professional standards. State v. Gates, supra, 466 S.W.2d at 683. Thus, and to reiterate, in Missouri an indigent criminal defendant receives a meticulous consideration of his claims of error upon his appeal of right, as a matter of local requirement.

The determinative consideration, however, is the fact that under our present criminal appellate practice a motion for rehearing—in reality—serves no function other than to exhaust the defendant's remedies in the Court of Appeals so he may seek discretionary review of his case in the Supreme Court of Missouri. True, a motion for rehearing *may* serve much the same purpose in the appellate court as does the modern motion for new trial in the trial court. When a motion for rehearing is filed, an appellate court may modify its opinion and deny the motion, but if a motion for a complete rehearing is

granted, the appeal stands as if it had never been heard and the opinion filed becomes a nullity as if it had never been written. In re McMenamy's Guardianship, 307 Mo. 98, 116–117, 270 S.W. 662, 667[6] (banc 1925); In re Thomasson's Estate, 192 S.W.2d 867, 870[4–6] (Mo.1946). Upon rehearing, an appellate court may adopt its former opinion, modify or expand its former opinion, or adopt a new and different opinion, Frohman v. Lowenstein, 303 Mo. 339, 348, 260 S.W. 460, 461[1] (banc 1924), but the court may not reverse its former holding without actual resubmission and rehearing of the appeal. Granite Bituminous Paving Co. v. Park View Realty and Improvement Co., 270 Mo. 698, 700–703, 196 S.W. 1142, 1143–1144 (banc 1917). Thus on a criminal appeal a motion for rehearing may be used, in the language of the *Ross* case, as a "sword to upset [a] prior determination of guilt", but in practice it serves no such function. Statistical inquiry among the three districts of the Court of Appeals reveals that during the period roughly corresponding with the last reporting period, July 1, 1973, to June 30, 1974, some 298 criminal opinions were filed. Motions for rehearing or alternative motions for rehearing or for transfer to the Supreme Court were filed in 71 of these 298 cases. Only two such motions were sustained. It is therefore clear, at least to us, that on a criminal appeal a motion for rehearing is merely an exhaustion device used to seek discretionary review in the highest court of this state.

We have neither the inclination nor the authority to suggest the limit to an indigent criminal defendant's right to counsel; we do not undertake to do so here. Nevertheless we conclude and hold that in this case the defendant has had an adequate opportunity to present his claims of error fairly within the adversarial system and

1. See, as examples, United States v. Tappen, 488 F.2d 142 (5th Cir. 1973); State v. Davis, 290 So.2d 30 (Fla.1974); People v. Wright, 3 Ill.App.3d 262, 278 N.E.2d 175 (1971); State v. Kellogg, 189 Neb. 692, 204 N.W.2d 567 (1973); Wells v. Leeke, 203 S.E.2d 428 (S.C.1974) (a postconviction proceeding); Jackson v. State, 485 S.W.2d 553 (Tex.Crim. App.1972); State v. Romano, 29 Utah 2d 237, 507 P.2d 1025 (1973).

that in the present state of the law, the trial court was not obliged to appoint new counsel to assist the defendant in pursuing his motion for rehearing in this court. The motion to require the appointment of new counsel is denied; the motion for rehearing is denied.

All of the Judges concur.

See also, Mo.App., 515 S.W.2d 597.